[Crim. No. 384.   Fourth Appellate District.—June 7, 1939.]

THE PEOPLE, Respondent, v. JACK A. KERMOTT, Appellant.

238

Fred A. Wilson for Appellant.

Earl Warren, Attorney-General, and Burdette J. Daniels, Deputy Attorney-General, for Respondent.

BARNARD, P. J.—The appellant was charged with the murder of his brother, James C. Kermott. A jury found him guilty of manslaughter and he appeals from the judgment and from an order denying his motion for a new trial.

The appellant lived on a two-acre tract north of the city of Upland, the house being about 80 feet back from the road and some 500 feet from the nearest other residence. There were a number of trees and shrubs to the east and south of the house, which faced in an easterly direction. On the evening of November 30, 1938, the appellant was playing cards with his wife and his wife's father and mother. At about 10 o'clock his wife went to the bathroom and on her return told the appellant that she had heard a noise outside of the house and requested him to go out and investigate. After waiting a few moments the appellant took a flashlight and a revolver

and went outside. He went out through a rear door and after looking around the west side of the house he passed around the north side and walked in an easterly direction across the front yard and toward the street.

Having seen nothing he started to return across the lawn toward the front door of the house. As he arrived at a point about fifteen or twenty feet from the front door he saw the figure of a man by a tree near the southeast corner of the house and some twenty feet to his left. He called out something, just what he could not remember, and immediately fired a shot at the intruder. About the time this shot was fired the man turned toward him and then started to walk easterly toward the street. The appellant followed him, firing three more shots and when he was within ten feet of him the man fell to the ground. The appellant approached and, as he testified, for the first time turned his flashlight upon the man and saw that he had shot his brother. He then entered the house and requested members of the family to call a doctor and the police, after which he went back and found that his brother had ceased breathing. When the officers arrived they found near the left hand of the deceased a sock, in the end of which had been tied a metal Chinese image. They also found footprints, similar to those which would be made by the tennis shoes worn by the deceased, along the south side of the house and near the northwest corner thereof, where the bathroom is located. The deceased's automobile was found parked on another road about 200 feet from the appellant's home. The appelant told them what had occurred, and on the next day he made a statement, which was taken down by a shorthand reporter, and testified at the inquest.

The deceased lived in Ontario, about nine miles from the appellant's home. He left his home about 9:45 P. M. on the night in question. His wife testified that the sock found near his body was one belonging to him, that she saw him put this sock in his pocket before he left home, but that she did not see the Chinese image, which was usually kept on a stand in their home. Evidence was received of ill-feeling between the brothers arising out of controversies over some books in the possession of the appellant, over some furniture which he had previously borrowed from the deceased, and over the appellant's handling of an estate in which he was a trustee. It appears that the two brothers had met by appointment and had held a conference at a street corner near the business district

of Upland, about 5 o'clock on the afternoon preceding the tragedy.

The appellant contends that the court erred in instructing the jury with regard to, and in submitting to it the issue of whether he was guilty of, murder, and further erred in admitting evidence concerning prior disputes and controversies between the brothers for the purpose of showing ill-will, malice and criminal intent. It is argued that it conclusively appears that the appellant did not know the identity of the intruder, and that evidence of ill-will or malice toward the brother was therefore inadmissible.

While the appellant testified and insisted at all times that he did not know that the intruder was his brother we think there was sufficient evidence to justify the submission of this issue to the jury. There was evidence that it was a rather clear night although there was a light high fog. A deputy sheriff testified that when he arrived shortly after the shooting he could distinguish between people who were known to him at a distance of 30 feet. The deceased was dressed exactly as he had been when the appellant saw him at 5 o'clock, wearing overalls, a dark blue shirt, a light gray sweater shirt, and tennis shoes. Although the appellant was carrying a large flashlight with which he said he could distinguish objects at from 70 to 75 feet, and which he had taken with him for the purpose of seeing who was there, he says he did not turn this flashlight toward the intruder until after he fell, although he followed him a considerable distance and was within 20 feet of him when he first shot. He testified that the intruder did not approach him, that he made no movement toward him with his hands, and that he walked away from him toward the road. He did say, however, that before the intruder started to walk away he turned, facing him. The bullet that killed the deceased entered his body about the middle of his chest and came out of his back. When the appellant went into the house after the shooting he said to his wife and his wife's parents: "Somebody came up once too often." When the officers came and asked what had happened, he told them "I have had trouble but it was not worth this". When asked at the inquest why he had arranged to meet the deceased at a street corner at 5 o'clock instead of asking him to come to his house, he replied: "To avoid trouble." It is not without significance that during that interview they had quarreled over some books, a part of which

were stored in the basement of appellant's home, which basement had an outside door, and that the deceased had said to the appellant that "he was going to get them some way or another". There was sufficient evidence to justify an inference that the appellant knew the identity of the intruder, the murder issue was properly submitted to the jury, and the evidence of prior disputes and ill-will was admissible on the question of malice.

■ It is next urged that the court, having admitted evidence of prior disputes between the brothers, erred in refusing to permit the appellant to introduce certain testimony for the purpose of showing that these disputes had been settled at least six weeks before the date of the homicide and that, therefore, any such occasion for ill-feeling, at least in so far as the appellant is concerned, had been terminated. The court rejected this evidence on the ground that the parties were not entitled to go into the merits of the previous controversies but were only entitled to go into the matter for the purpose of showing whether or not any ill-feeling existed. In our opinion, the court unduly restricted the appellant with respect to going into these matters. While some of the rulings thereon were technically correct, it clearly appears that a considerable portion of the rejected evidence went to the issue as to whether or not ill-feeling existed at the time of the shooting rather than to the merits of the prior controversies.

However, we think these errors were not prejudicial for two reasons. While it was sought by the offered evidence to show that any cause for ill-feeling between the brothers growing out of these matters had been terminated, the testimony of the appellant himself discloses that as a matter of fact such feeling still existed. In appellant's statement made the following day, in referring to the interview he had had with his brother about five hours before the shooting occurred, the following appears: "Q. What was said about the books? A. He said he wanted the books. Q. What did you say? A. I told him he could not have them. Q. What did he say? A. He got kind of mad. Q. What did he say? A. I don't remember exactly the words he said. Q. Were you mad? A. Sure I was mad. Q. You got angry? A. Yes." A further consideration is that the jurors would have found the appellant guilty of murder if they had believed that he was actuated by malice toward the person whom he shot. Having

found him guilty of manslaughter the jury has impliedly found that there was no malice or ill-will, and any errors in receiving or rejecting evidence relating thereto were not prejudicial.

■ Error is assigned in the giving of certain instructions. A long instruction defining the degrees of murder and kinds of manslaughter, and covering what is and what is not sufficient to constitute these various crimes, is first attacked. It is stated that while this instruction may be correct ''as a treatise on the law of homicide'' certain portions thereof are erroneous. It is argued that a portion of the instruction referring to the intention of the legislature in dividing murder into degrees and establishing tests by which degrees of murder may be determined is argumentative, and that other portions to the effect that the ''intention to kill and the act of killing . . . may be as instantaneous as successive thoughts of the mind'' are instructions as to the existence of facts which should be left to the jury. These portions of this instruction are in the usual form, have been approved many times, and the objection here made is without merit. ■ It is further urged that a portion of this instruction, to the effect that there is a natural presumption that an assailant intends death or great bodily harm where he violently assails another with a dangerous weapon which is likely to and which does in fact destroy the life of the party assailed, is erroneous. It is argued that this fails to distinguish between one who assails another voluntarily and one who is forced to do so in self-defense. This element was amply covered in many other parts of the instructions, including the use of the words ''voluntarily'' and ''wilfully'' in giving the same rule, in another language, in the sentence preceding the one which is here questioned.

■ It is next contended that two instructions relating to what is justifiable homicide, in setting forth the requirement that the accused believed certain things at the time ''as a reasonable man'', were erroneous in failing to refer to the conduct of a reasonable man ''under the same or similar circumstances''. The general circumstances were rather completely referred to and the instruction could not be taken other than as referring to the conduct of a reasonable man under those circumstances. ■ In another instruction the jurors were told that if any witness had, in their judgment, sworn

falsely in any respect the witness was to be distrusted in other respects and "his or her testimony should not be acted upon without great caution". The quoted portion is criticised, the appellant arguing that even if a witness had testified falsely in one respect the jury had a right to believe other portions of his testimony. The court so told the jury in the same instruction, saying: "The jurors may believe the whole or any part of the testimony of any witness." ██ It is further argued that the effect of this instruction was directed particularly against the appellant and members of his family since they were the sole witnesses as to what transpired just before the shooting. Not only is this contention untenable, but we are pointed to no false testimony given by these witnesses which could have led to the jury's misapplying this instruction. While the criticised portion of this instruction might well have been omitted, when it is taken with the context no prejudicial error appears. Finally, it is claimed that an instruction on self-defense or justifiable homicide is erroneous in that it fails to take into consideration the unusual circumstances of this case, where an unknown intruder unexpectedly appeared upon appellant's premises. This instruction, with other instructions upon the same and related subjects, fully covered this issue as presented by the evidence and we find no error.

██ Complaint is made of the court's refusal to give certain instructions asked for by the appellant. The first of these covered the rule usually applied in civil cases that a person confronted with imminent danger is not required to exercise the same degree of care and caution that is required of one under other circumstances. In so far as here applicable, the matter was fully covered by instructions which were given. In the second instance, although the court had given an instruction on excusable homicide following the language of the statute, the offered instruction attempted to define and apply the word "accident" in a manner not provided for in the statute. It is argued that a further requested instruction should have been given since it covered the matter of fear on the part of the appellant created by the mere presence of the deceased upon the appellant's premises, which element it is said was not covered in the instructions on self-defense and justifiable homicide which were given by the court. The general subject was covered in several instructions given. While one of these mentioned an "overt act" on the part of the deceased,

who was the intruder, it is still true that the mere presence of the deceased at the time and place in question was, in itself, an overt act. We think that the matter was sufficiently covered and that no prejudicial error appears.

It is contended that the district attorney was guilty of prejudicial misconduct. In his opening statement a deputy district attorney stated that they would contend that the deceased went to the appellant's home that night by "arranged appointment" with the appellant. On two occasions while the appellant was on the stand he was asked, in effect, whether he had not made such an appointment, which he denied. No attempt was made to prove that such an appointment had been made other than by a question asked of the wife of the deceased, an objection to which was sustained. The wife of the deceased was asked as to their family and was allowed to testify that she and her husband had a son and a daughter. It is argued that this was dragged in for the purpose of inciting prejudice against the appellant. When the appellant denied having answered a question in a certain manner, in his statement which was taken on the afternoon of December 1st, the deputy district attorney asked him "Have you got anything else you would like to change in your statement?" An objection was sustained and, at the request of the appellant, the court instructed the jury to disregard the remarks made by counsel and to consider only the evidence. In referring to the estate in which the appellant was a trustee, and concerning which some dispute between the brothers had previously arisen, the deputy district attorney asked the appellant "At this time you are the only living beneficiary named in that will, aren't you?" It is insisted that this was intended to suggest to the jury that the appellant had profited by killing his brother. An objection was sustained but the court was not requested to instruct the jury to disregard the matter. It is argued that these various matters were injected by the district attorney for the purpose of prejudicing the jury against him and that they had such a result.

With respect to most of these matters the action of the deputy district attorney was unnecessary and inexcusable. As was said in *People* v. *Shaw*, 111 Cal. 171 [43 Pac. 593]: "These alleged errors could and should have been avoided; but criminal cases are too often conducted upon the preconceived theory that the defendant is guilty, and that if he be

given a fair trial, according to the established rules of evidence, the jury may not convict him.'' In view of the record here, which we have read in its entirety, we are unable to hold that these evidences of mistaken zeal or unfairness on the part of the district attorney are sufficiently prejudicial to justify a reversal. While we do not approve of the conduct of the district attorney in these and certain other respects we are far from convinced that a miscarriage of justice has occurred. While minor errors appear, as is more or less natural in the trial of a case of this length and nature, a reading of the record leaves a strong impression that the result was quite favorable to the appellant.

The order and judgment are affirmed.

Marks, J., and Griffin, J., concurred.