[No. S045985. Aug. 29, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
EVELYN HUMPHREY, Defendant and Appellant.

## COUNSEL

Jim Fahey, under appointment by the Supreme Court, for Defendant and Appellant.

Minouche Kandel as Amicus Curiae on behalf of Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe and Janet E. Neeley, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHIN, J.**—The Legislature has decreed that, when relevant, expert testimony regarding "battered women's syndrome" is generally admissible in a criminal action. (Evid. Code, § 1107.) We must determine the purposes for which a jury may consider this evidence when offered to support a claim of self-defense to a murder charge.

The trial court instructed that the jury could consider the evidence in deciding whether the defendant actually believed it was necessary to kill in self-defense, but not in deciding whether that belief was reasonable. The instruction was erroneous. Because evidence of battered women's syndrome may help the jury understand the circumstances in which the defendant found herself at the time of the killing, it is relevant to the reasonableness of her belief. Moreover, because defendant testified, the evidence was relevant to her credibility. The trial court should have allowed the jury to consider

this testimony in deciding the reasonableness as well as the existence of defendant's belief that killing was necessary.

Finding the error prejudicial, we reverse the judgment of the Court of Appeal.

## I.  THE FACTS

### A.  *Prosecution Evidence*

During the evening of March 28, 1992, defendant shot and killed Albert Hampton in their Fresno home. Officer Reagan was the first on the scene. A neighbor told Reagan that the couple in the house had been arguing all day. Defendant soon came outside appearing upset and with her hands raised as if surrendering. She told Officer Reagan, "I shot him. That's right, I shot him. I just couldn't take him beating on me no more." She led the officer into the house, showed him a .357 magnum revolver on a table, and said, "There's the gun." Hampton was on the kitchen floor, wounded but alive.

A short time later, defendant told Officer Reagan, "He deserved it. I just couldn't take it anymore. I told him to stop beating on me." "He was beating on me, so I shot him. I told him I'd shoot him if he ever beat on me again." A paramedic heard her say that she wanted to teach Hampton "a lesson." Defendant told another officer at the scene, Officer Terry, "I'm fed up. Yeah, I shot him. I'm just tired of him hitting me. He said, 'You're not going to do nothing about it.' I showed him, didn't I? I shot him good. He won't hit anybody else again. Hit me again; I shoot him again. I don't care if I go to jail. Push come to shove, I guess people gave it to him, and, kept hitting me. I warned him. I warned him not to hit me. He wouldn't listen."

Officer Terry took defendant to the police station, where she told the following story. The day before the shooting, Hampton had been drinking. He hit defendant while they were driving home in their truck and continued hitting her when they arrived. He told her, "I'll kill you," and shot at her. The bullet went through a bedroom window and struck a tree outside. The day of the shooting, Hampton "got drunk," swore at her, and started hitting her again. He walked into the kitchen. Defendant saw the gun in the living room and picked it up. Her jaw hurt, and she was in pain. She pointed the gun at Hampton and said, "You're not going to hit me anymore." Hampton said, "What are you doing?" Believing that Hampton was about to pick something up to hit her with, she shot him. She then put the gun down and went outside to wait for the police.

Hampton later died of a gunshot wound to his chest. The neighbor who spoke with Officer Reagan testified that shortly before the shooting, she

heard defendant, but not Hampton, shouting. The evening before, the neighbor had heard a gunshot. Defendant's blood contained no drugs but had a blood-alcohol level of .17 percent. Hampton's blood contained no drugs or alcohol.

## B. *Defense Evidence*

Defendant claimed she shot Hampton in self-defense. To support the claim, the defense presented first expert testimony and then nonexpert testimony, including that of defendant herself.

### 1. *Expert Testimony*

Dr. Lee Bowker testified as an expert on battered women's syndrome. The syndrome, he testified, "is not just a psychological construction, but it's a term for a wide variety of controlling mechanisms that the man or it can be a woman, but in general for this syndrome it's a man, uses against the woman, and for the effect that those control mechanisms have."

Dr. Bowker had studied about 1,000 battered women and found them often inaccurately portrayed "as cardboard figures, paper-thin punching bags who merely absorb the violence but didn't do anything about it." He found that battered women often employ strategies to stop the beatings, including hiding, running away, counterviolence, seeking the help of friends and family, going to a shelter, and contacting police. Nevertheless, many battered women remain in the relationship because of lack of money, social isolation, lack of self-confidence, inadequate police response, and a fear (often justified) of reprisals by the batterer. "The battering man will make the battered woman depend on him and generally succeed at least for a time." A battered woman often feels responsible for the abusive relationship, and "she just can't figure out a way to please him better so he'll stop beating her." In sum, "It really is the physical control of the woman through economics and through relative social isolation combined with the psychological techniques that make her so dependent."

Many battered women go from one abusive relationship to another and seek a strong man to protect them from the previous abuser. "[W]ith each successful victimization, the person becomes less able to avoid the next one." The violence can gradually escalate, as the batterer keeps control using ever more severe actions, including rape, torture, violence against the woman's loved ones or pets, and death threats. Battered women sense this escalation. In Dr. Bowker's "experience with battered women who kill in self-defense their abusers, it's always related to their perceived change of

what's going on in a relationship. They become very sensitive to what sets off batterers. They watch for this stuff very carefully. [¶] . . . Anybody who is abused over a period of time becomes sensitive to the abuser's behavior and when she sees a change acceleration begin in that behavior, it tells them something is going to happen . . . ."

Dr. Bowker interviewed defendant for a full day. He believed she suffered not only from battered women's syndrome, but also from being the child of an alcoholic and an incest victim. He testified that all three of defendant's partners before Hampton were abusive and significantly older than she.

Dr. Bowker described defendant's relationship with Hampton. Hampton was a 49-year-old man who weighed almost twice as much as defendant. The two had a battering relationship that Dr. Bowker characterized as a "traditional cycle of violence." The cycle included phases of tension building, violence, and then forgiveness-seeking in which Hampton would promise not to batter defendant any more and she would believe him. During this period, there would be occasional good times. For example, defendant told Dr. Bowker that Hampton would give her a rose. "That's one of the things that hooks people in. Intermittent reinforcement is the key." But after a while, the violence would begin again. The violence would recur because "basically . . . the woman doesn't perfectly obey. That's the bottom line." For example, defendant would talk to another man, or fail to clean house "just so."

The situation worsened over time, especially when Hampton got off parole shortly before his death. He became more physically and emotionally abusive, repeatedly threatened defendant's life, and even shot at her the night before his death. Hampton often allowed defendant to go out, but she was afraid to flee because she felt he would find her as he had in the past. "He enforced her belief that she can never escape him." Dr. Bowker testified that unless her injuries were so severe that "something absolutely had to be treated," he would not expect her to seek medical treatment. "That's the pattern of her life . . . ."

Dr. Bowker believed defendant's description of her experiences. In his opinion, she suffered from battered women's syndrome in "about as extreme a pattern as you could find."

## 2. *Nonexpert Testimony*

Defendant confirmed many of the details of her life and relationship with Hampton underlying Dr. Bowker's opinion. She testified that her father

forcefully molested her from the time she was seven years old until she was fifteen. She described her relationship with another abusive man as being like "Nightmare on Elm Street." Regarding Hampton, she testified that they often argued and that he beat her regularly. Both were heavy drinkers. Hampton once threw a can of beer at her face, breaking her nose. Her dental plates hurt because Hampton hit her so often. He often kicked her, but usually hit her in the back of the head because, he told her, it "won't leave bruises." Hampton sometimes threatened to kill her, and often said she "would live to regret it." Matters got worse towards the end.

The evening before the shooting, March 27, 1992, Hampton arrived home "very drunk." He yelled at her and called her names. At one point when she was standing by the bedroom window, he fired his .357 magnum revolver at her. She testified, "He didn't miss me by much either." She was "real scared."

The next day, the two drove into the mountains. They argued, and Hampton continually hit her. While returning, he said that their location would be a good place to kill her because "they wouldn't find [her] for a while." She took it as a joke, although she feared him. When they returned, the arguing continued. He hit her again, then entered the kitchen. He threatened, "This time, bitch, when I shoot at you, I won't miss." He came from the kitchen and reached for the gun on the living room table. She grabbed it first, pointed it at him, and told him "that he wasn't going to hit [her]." She backed Hampton into the kitchen. He was saying something, but she did not know what. He reached for her hand and she shot him. She believed he was reaching for the gun and was going to shoot her.

Several other witnesses testified about defendant's relationship with Hampton, his abusive conduct in general, and his physical abuse of, and threats to, defendant in particular. This testimony generally corroborated defendant's. A neighbor testified that the night before the shooting, she heard a gunshot. The next morning, defendant told the neighbor that Hampton had shot at her, and that she was afraid of him. After the shooting, investigators found a bullet hole through the frame of the bedroom window and a bullet embedded in a tree in line with the window. Another neighbor testified that shortly before hearing the shot that killed Hampton, she heard defendant say, "Stop it, Albert. Stop it."

## C. *Procedural History*

Defendant was charged with murder with personal use of a firearm. At the end of the prosecution's case-in-chief, the court granted defendant's motion under Penal Code section 1118.1 for acquittal of first degree murder.

The court instructed the jury on second degree murder and both voluntary and involuntary manslaughter. It also instructed on self-defense, explaining that an actual and reasonable belief that the killing was necessary was a complete defense; an actual but unreasonable belief was a defense to murder, but not to voluntary manslaughter. In determining reasonableness, the jury was to consider what "would appear to be necessary to a reasonable person in a similar situation and with similar knowledge."

The court also instructed:

"Evidence regarding Battered Women's Syndrome has been introduced in this case. Such evidence, if believed, may be considered by you only for the purpose of determining whether or not the defendant held the necessary subjective honest [belief] which is a requirement for both perfect and imperfect self-defense. However, that same evidence regarding Battered Women's Syndrome may not be considered or used by you in evaluating the objective reasonableness requirement for perfect self-defense.

". . . . . . . . . . . . . . . . . . . . . . . .

"Battered Women's Syndrome seeks to describe and explain common reactions of women to that experience. Thus, you may consider the evidence concerning the syndrome and its effects only for the limited purpose of showing, if it does show, that the defendant's reactions, as demonstrated by the evidence, are not inconsistent with her having been physically abused or the beliefs, perceptions, or behavior of victims of domestic violence."

During deliberations, the jury asked for and received clarification of the terms "subjectively honest and objectively unreasonable." It found defendant guilty of voluntary manslaughter with personal use of a firearm. The court sentenced defendant to prison for eight years, consisting of the lower term of three years for manslaughter, plus the upper term of five years for firearm use. The Court of Appeal remanded for resentencing on the use enhancement, but otherwise affirmed the judgment.

We granted defendant's petition for review.

## II. Discussion

### A. *Background*

With an exception not relevant here, Evidence Code section 1107, subdivision (a), makes admissible in a criminal action expert testimony regarding "battered women's syndrome, including the physical, emotional, or mental

effects upon the beliefs, perceptions, or behavior of victims of domestic violence . . . ." Under subdivision (b) of that section, the foundation for admission is sufficient "if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness."[1] Defendant presented the evidence to support her claim of self-defense. It is undisputed that she established the proper qualifications of the expert witness. The only issue is to what extent defendant established its "relevancy." To resolve this question we must examine California law regarding self-defense.

For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 674 [160 Cal.Rptr. 84, 603 P.2d 1].) If the belief subjectively exists but is objectively unreasonable, there is "imperfect self-defense," i.e., "the defendant is deemed to have acted without malice and cannot be convicted of murder," but can be convicted of manslaughter. (*In re Christian S.* (1994) 7 Cal.4th 768, 783 [30 Cal.Rptr.2d 33, 872 P.2d 574].)[2] To constitute "perfect self-defense," i.e., to exonerate the person completely, the belief must also be objectively reasonable. (*Id.* at p. 783; see also *People* v. *Aris* (1989) 215 Cal.App.3d 1178, 1186 [264 Cal.Rptr. 167].) As the Legislature has stated, "[T]he circumstances must be sufficient to excite the fears of a reasonable person . . . ." (Pen. Code, § 198; see also § 197, subds. 2, 3.) Moreover, for either perfect or imperfect self-defense, the fear must be of imminent harm. "Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." (*In re Christian S., supra*, 7 Cal.4th at p. 783, italics in original.)

Although the belief in the need to defend must be objectively reasonable, a jury must consider what "would appear to be necessary to a reasonable

[1]Evidence Code section 1107 was adopted in 1991, effective January 1, 1992. (Stats. 1991, ch. 812, § 1.) It currently provides: "(a) In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the physical, emotional, or mental effects upon the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge.

"(b) The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness. Expert opinion testimony on battered women's syndrome shall not be considered a new scientific technique whose reliability is unproven.

"(c) For purposes of this section, 'abuse' is defined in Section 6203 of the Family Code and 'domestic violence' is defined in Section 6211 of the Family Code.

"(d) This section is intended as a rule of evidence only and no substantive change affecting the Penal Code is intended."

[2]*People* v. *Flannel, supra*, 25 Cal.3d 668, and other cases referred to an "honest belief," but in *In re Christian S., supra*, 7 Cal.4th at page 773, we expressed a preference for "the more precise term '*actual belief.*' " (Italics in original.)

person in a similar situation and with similar knowledge . . . ." (CALJIC No. 5.50.) It judges reasonableness "from the point of view of a reasonable person in the position of defendant . . . ." (*People* v. *McGee* (1947) 31 Cal.2d 229, 238 [187 P.2d 706].) To do this, it must consider all the " ' "facts and circumstances . . . in determining whether the defendant acted in a manner in which *a reasonable man* would act in protecting his own life or bodily safety." ' " (*People* v. *Moore* (1954) 43 Cal.2d 517, 528 [275 P.2d 485], italics in original.) As we stated long ago, ". . . a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind . . . ." (*People* v. *Smith* (1907) 151 Cal. 619, 628 [91 P. 511].)

We recently discussed this question in a different context. In *People* v. *Ochoa* (1993) 6 Cal.4th 1199 [26 Cal.Rptr.2d 23, 864 P.2d 103], the defendant was convicted of gross vehicular manslaughter while intoxicated. The offense requires "gross negligence," the test for which is " 'objective: whether a reasonable person in the defendant's position would have been aware of the risk involved. [Citation.]' [Citation.]" (*Id.* at p. 1204, quoting *People* v. *Bennett* (1991) 54 Cal.3d 1032, 1036 [2 Cal.Rptr.2d 8, 819 P.2d 849].) The defendant argued that, "because the test of gross negligence is an *objective* one . . . , evidence of his own subjective state of mind was irrelevant and unduly prejudicial." (*People* v. *Ochoa*, *supra*, at p. 1205, italics in original.) We disagreed. "In determining whether a reasonable person *in defendant's position* would have been aware of the risks, the jury should be given relevant facts as to what defendant knew, including his actual awareness of those risks." (*Ibid.*, italics in original.) "[A]lthough the test for gross negligence was an objective one, '[t]he jury should therefore consider all relevant circumstances . . . . [Citations.]' " (*Ibid.*, quoting *People* v. *Bennett*, *supra*, 54 Cal.3d at p. 1038.)

What we said in *Ochoa* about the defendant's actual awareness applies to this case. Although the ultimate test of reasonableness is objective, in determining whether a reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which defendant found herself.

With these principles in mind, we now consider the relevance of evidence of battered women's syndrome to the elements of self-defense.

### B.   *Battered Women's Syndrome*[3]

Battered women's syndrome "has been defined as 'a series of common characteristics that appear in women who are abused physically and

---

[3]We use the term "battered women's syndrome" because Evidence Code section 1107 and the cases use that term. We note, however, that according to amici curiae California Alliance

psychologically over an extended period of time by the dominant male figure in their lives.' (*State* v. *Kelly* (1984) 97 N.J. 178, 193 [478 A.2d 364, 371]; see also *People* v. *Aris* (1989) 215 Cal.App.3d 1178, 1194 [264 Cal.Rptr. 167] [' "a pattern of psychological symptoms that develop after somebody has lived in a battering relationship" ']; Note, *Battered Women Who Kill Their Abusers* (1993) 106 Harv.L.Rev. 1574, 1578 ['a "pattern of responses and perceptions presumed to be characteristic of women who have been subjected to continuous physical abuse by their mate[s]" '].)" (*People* v. *Romero* (1994) 8 Cal.4th 728, 735, fn. 1 [35 Cal.Rptr.2d 270, 883 P.2d 388].)

■ The trial court allowed the jury to consider the battered women's syndrome evidence in deciding whether defendant actually believed she needed to kill in self-defense. The question here is whether the evidence was also relevant on the reasonableness of that belief. Two Court of Appeal decisions have considered the relevance of battered women's syndrome evidence to a claim of self-defense.

*People* v. *Aris, supra,* 215 Cal.App.3d at page 1185, applied "the law of self-defense in the context of a battered woman killing the batterer while he slept after he had beaten the killer and threatened serious bodily injury and death when he awoke." There, unlike here, the trial court refused to instruct the jury on perfect self-defense, but it did instruct on imperfect self-defense. The appellate court upheld the refusal, finding that "defendant presented no substantial evidence that a reasonable person under the same circumstances would have perceived imminent danger and a need to kill in self-defense." (*Id.* at p. 1192.)[4] The trial court admitted some evidence of battered women's syndrome, but the defendant argued that it erred "by excluding expert testimony (1) that defendant was a battered woman based on the expert's psychological evaluation of the defendant and (2) 'explaining how the psychological impact of being a battered woman affected her perception of danger at the time she shot her husband.' " (*People* v. *Aris, supra,* 215 Cal.App.3d at p. 1193.)

Against Domestic Violence et al., ". . . the preferred term among many experts today is 'expert testimony on battering and its effects' or 'expert testimony on battered women's experiences.' Domestic violence experts have critiqued the phrase 'battered women's syndrome' because (1) it implies that there is one syndrome which all battered women develop, (2) it has pathological connotations which suggest that battered women suffer from some sort of sickness, (3) expert testimony on domestic violence refers to more than women's psychological reactions to violence, (4) it focuses attention on the battered woman rather than on the batterer's coercive and controlling behavior and (5) it creates an image of battered women as suffering victims rather than as active survivors." (Fns. omitted.)

[4]This case presents no issue as to when the instructions are necessary because the court did instruct on both perfect and imperfect self-defense. Unlike *People* v. *Aris, supra,* 215 Cal.App.3d 1178, there was substantial evidence here that defendant reasonably feared imminent harm. (See *In re Christian S., supra,* 7 Cal.4th at p. 783.)

Although the trial court did not instruct on perfect self-defense, the appellate court first concluded that battered women's syndrome evidence is not relevant to the reasonableness element. "[T]he questions of the reasonableness of a defendant's belief that self-defense is necessary and of the reasonableness of the actions taken in self-defense do not call for an evaluation of the defendant's subjective *state of mind*, but for an objective evaluation of the defendant's assertedly defensive *acts*. California law expresses the criterion for this evaluation in the objective terms of whether *a reasonable person*, as opposed to the *defendant*, would have believed and acted as the defendant did. We hold that expert testimony about a defendant's state of mind is not relevant to the reasonableness of the defendant's self-defense." (*People* v. *Aris, supra*, 215 Cal.App.3d at p. 1196, italics in original.)

The court then found the evidence "highly relevant to the first element of self-defense—defendant's actual, subjective perception that she was in danger and that she had to kill her husband to avoid that danger. . . . [¶] The relevance to the defendant's actual perception lies in the opinion's explanation of how such a perception would reasonably follow from the defendant's experience as a battered woman. This relates to the prosecution's argument that such a perception of imminent danger makes no sense when the victim is asleep and a way of escape open and, therefore, she did not actually have that perception." (*People* v. *Aris, supra*, 215 Cal.App.3d at p. 1197.) The trial court thus erred in not admitting the testimony to show "how the defendant's particular experiences as a battered woman affected her perceptions of danger, its imminence, and what actions were necessary to protect herself." (*Id.* at p. 1198.)

Concerned "that the jury in a particular case may misuse such evidence to establish the reasonableness requirement for perfect self-defense, for which purpose it is irrelevant," the *Aris* court stated that, "upon request whenever the jury is instructed on perfect self-defense, trial courts should instruct that such testimony is relevant only to prove the honest belief requirement for both perfect and imperfect self-defense, not to prove the reasonableness requirement for perfect self-defense." (*People* v. *Aris, supra*, 215 Cal.App.3d at p. 1199.) The trial court gave such an instruction here, thus creating the issue before us.

In *People* v. *Day* (1992) 2 Cal.App.4th 405 [2 Cal.Rptr.2d 916], the defendant moved for a new trial following her conviction of involuntary manslaughter. Supported by an affidavit by Dr. Bowker, she argued that her attorney should have presented evidence of battered women's syndrome to aid her claim of self-defense. Relying on *Aris*, the appellate court first found

that the evidence would not have been relevant to show the objective reasonableness of the defendant's actions. (*People* v. *Day*, *supra*, at pp. 414-415.) It also found, however, that the evidence would have been admissible to rehabilitate the defendant's credibility as a witness. (*Id.* at pp. 415-419.) Finding that counsel's failure to present the evidence was prejudicial, the court reversed the judgment. (*Id.* at pp. 419-420.)

The Attorney General argues that *People* v. *Aris*, *supra*, 215 Cal.App.3d 1178, and *People* v. *Day*, *supra*, 2 Cal.App.4th 405, were correct that evidence of battered women's syndrome is irrelevant to reasonableness. We disagree. Those cases too narrowly interpreted the reasonableness element. *Aris* and *Day* failed to consider that the jury, in determining objective reasonableness, must view the situation from the *defendant's perspective*. Here, for example, Dr. Bowker testified that the violence can escalate and that a battered woman can become increasingly sensitive to the abuser's behavior, testimony relevant to determining whether defendant reasonably believed when she fired the gun that this time the threat to her life was imminent. Indeed, the prosecutor argued that, "from an objective, reasonable man's standard, there was no reason for her to go get that gun. This threat that she says he made was like so many threats before. There was no reason for her to react that way." Dr. Bowker's testimony supplied a response that the jury might not otherwise receive. As violence increases over time, and threats gain credibility, a battered person might become sensitized and thus able reasonably to discern when danger is real and when it is not. "[T]he expert's testimony might also enable the jury to find that the battered [woman] . . . is particularly able to predict accurately the likely extent of violence in any attack on her. That conclusion could significantly affect the jury's evaluation of the *reasonableness* of defendant's fear for her life." (*State* v. *Kelly* (1984) 97 N.J. 178 [478 A.2d 364, 378], italics added, fn. omitted.)

■ The Attorney General concedes that Hampton's behavior towards defendant, including prior threats and violence, was relevant to reasonableness (see *People* v. *Minifie* (1996) 13 Cal.4th 1055, 1065 [56 Cal.Rptr.2d 133, 920 P.2d 1337]), but distinguishes between evidence of this *behavior*—which the trial court fully admitted—and *expert testimony* about its effects on defendant. The distinction is untenable. "To effectively present the situation as perceived by the defendant, and the reasonableness of her fear, the defense has the option to explain her feelings to enable the jury to overcome stereotyped impressions about women who remain in abusive relationships. It is appropriate that the jury be given a professional explanation of the battering syndrome and its effects on the woman through the use of expert testimony. [Citation.]" (*State* v. *Allery* (1984) 101 Wn.2d 591 [682 P.2d 312, 316].)

The Attorney General also argues that allowing consideration of this testimony would result in an undesirable "battle of the experts" and raises the specter of other battles of experts regarding other syndromes. The Legislature, however, has decided that, if relevant, expert evidence on battered women's syndrome is admissible. (Evid. Code, § 1107.) We have found it relevant; it is therefore admissible. We express no opinion on the admissibility of expert testimony regarding other possible syndromes in support of a claim of self-defense, but we rest today's holding on Evidence Code section 1107.

Contrary to the Attorney General's argument, we are not changing the standard from objective to subjective, or replacing the reasonable "person" standard with a reasonable "battered woman" standard. Our decision would not, in another context, compel adoption of a " 'reasonable gang member' standard." Evidence Code section 1107 states "a rule of evidence only" and makes "no substantive change." (Evid. Code, § 1107, subd. (d).) The jury must consider defendant's situation and knowledge, which makes the evidence relevant, but the ultimate question is whether a reasonable *person*, not a reasonable battered woman, would believe in the need to kill to prevent imminent harm. Moreover, it is the *jury*, not the expert, that determines whether defendant's belief and, ultimately, her actions, were objectively reasonable.

■ Battered women's syndrome evidence was also relevant to defendant's credibility. It "would have assisted the jury in objectively analyzing [defendant's] claim of self-defense by dispelling many of the commonly held misconceptions about battered women." (*People* v. *Day, supra*, 2 Cal.App.4th at p. 416.) For example, in urging the jury not to believe defendant's testimony that Hampton shot at her the night before the killing, the prosecutor argued that "if this defendant truly believed that [Hampton] had shot at her, on that night, I mean she would have left. . . . [¶] If she really believed that he had tried to shoot her, she would not have stayed." Dr. Bowker's testimony " 'would help dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time. The expert evidence would counter any "common sense" conclusions by the jury that if the beatings were really that bad the woman would have left her husband much earlier. Popular misconceptions about battered women would be put to rest . . . .' " (*People* v. *Day, supra*, 2 Cal.App.4th at p. 417, quoting *State* v. *Hodges* (1986) 293 Kan. 63 [716 P.2d 563, 567].) "[I]f the jury had understood [defendant's] conduct in light of [battered women's syndrome] evidence, then the jury may well have concluded her version of the events was sufficiently credible to warrant an acquittal on the facts as she related them." (*People* v. *Day, supra*, 2 Cal.App.4th at p. 415.)

■ As *Day* recognizes, *People* v. *McAlpin* (1991) 53 Cal.3d 1289 [283 Cal.Rptr. 382, 812 P.2d 563] supports this conclusion. There we held that expert testimony regarding parental reluctance to report child molestation was admissible to bolster a witness's credibility: "Most jurors, fortunately, have been spared the experience of being the parent of a sexually molested child. Lacking that experience, jurors can rely only on their intuition or on relevant evidence introduced at trial. . . . [Evidence that parents often do not report child molestation] would therefore 'assist the trier of fact' (Evid. Code, § 801, subd. (a)) by giving the jurors information they needed to objectively evaluate [the witness's] credibility." (*Id.* at p. 1302, fn. omitted.) **(2c)** As in *McAlpin*, the expert testimony in this case was " 'needed to disabuse jurors of commonly held misconceptions . . . .' " (*Id.* at p. 1301.) It was relevant "to explain a behavior pattern that might otherwise appear unreasonable to the average person. Evidence of [battered women's syndrome] not only explains how a battered woman might think, react, or behave, it places the behavior in an understandable light." (*People* v. *Day,* *supra,* 2 Cal.App.4th at p. 419.) Thus, it was admissible under Evidence Code sections 801 and 1107.

We do not hold that Dr. Bowker's entire testimony was relevant to both prongs of perfect self-defense. Just as many types of evidence may be relevant to some disputed issues but not all, some of the expert evidence was no doubt relevant only to the subjective existence of defendant's belief. Evidence merely showing that a person's use of deadly force is scientifically explainable or empirically common does not, in itself, show it was objectively reasonable. To dispel any possible confusion, it might be appropriate for the court, on request, to clarify that, in assessing reasonableness, the question is whether a reasonable person in the defendant's circumstances would have perceived a threat of imminent injury or death, and not whether killing the abuser was reasonable in the sense of being an understandable response to ongoing abuse; and that, therefore, in making that assessment, the jury may not consider evidence merely showing that an abused person's use of force against the abuser is understandable.[5]

We also emphasize that, as with any evidence, the jury may give this testimony whatever weight it deems appropriate in light of the evidence as a whole. The ultimate judgment of reasonableness is solely for the jury. We simply hold that evidence of battered women's syndrome is generally *relevant* to the reasonableness, as well as the subjective existence, of defendant's

[5]If the prosecution offers the battered women's syndrome evidence, an additional limiting instruction might also be appropriate on request, given the statutory prohibition against use of this evidence "to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (Evid. Code, § 1107, subd. (a); see CALJIC No. 9.35.01 (1996 new)(5th ed. Supp.).)

belief in the need to defend, and, to the extent it is relevant, the jury may *consider* it in deciding both questions. The court's contrary instruction was erroneous. We disapprove of *People* v. *Aris, supra,* 215 Cal.App.3d 1178, and *People* v. *Day, supra,* 2 Cal.App.4th 405, to the extent they are inconsistent with this conclusion.

### C. *Prejudice*

Defendant contends that the instructional error unconstitutionally deprived her of her rights to present a defense and to equal protection of the laws, thus requiring reversal unless the error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) We disagree that the *Chapman* standard applies. The erroneous instruction may have adversely *affected* the defense, but it did not deprive her of the right to present one or deny her equal protection. In effect, the court excluded some evidence as to one element of the defense. When the reviewing court applying state law finds an erroneous exclusion of defense evidence, the usual standard of review for state law error applies: the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant. (*People* v. *Fudge* (1994) 7 Cal.4th 1075, 1102-1103 [31 Cal.Rptr.2d 321, 875 P.2d 36]; *People* v. *Cudjo* (1993) 6 Cal.4th 585, 611 [25 Cal.Rptr.2d 390, 863 P.2d 635] [error in excluding evidence of third party culpability]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; Evid. Code, § 354.)

Under this standard, however, we conclude the error was prejudicial. The jury found defendant guilty of voluntary manslaughter, not murder. Although the verdict may have been based on a finding of provocation, the arguments to the jury and the jury's request for clarification of the terms "subjectively honest and objectively unreasonable" suggest the question of unreasonable self-defense was critical. The jury likely concluded that defendant actually believed in the need to defend, but her belief was unreasonable. If so, guilt or innocence hinged on the precise issue—objective reasonableness—on which the court told the jury not to consider the battered women's syndrome evidence. As stated above, the prosecutor argued that defendant's actions were unreasonable because the last "threat that she says he made was like so many threats before. There was no reason for her to react that way." The testimony the court told the jury not to consider was directly responsive to this argument.

Although we do not know what weight the jury would have given the expert testimony in determining reasonableness, the testimony "was not only

relevant, but critical in permitting the jury to evaluate [defendant's] testimony free of the misperceptions regarding battered women." (*People* v. *Day, supra,* 2 Cal.App.4th at p. 419.) Overall, the evidence, including defendant's corroborated testimony about the shooting the night before, presented a plausible case for perfect self-defense. The actual verdict was reasonable, but so too would have been a different one. Under all of these circumstances, it is reasonably probable the error affected the verdict adversely to defendant.

## III. DISPOSITION

The judgment of the Court of Appeal is reversed.

George, C. J., Mosk, J., Kennard, J., and Werdegar, J., concurred.

**BAXTER, J.,** Concurring.—I have joined the concurring opinion of Justice Brown, which offers a cogent analysis of the relevance and admissibility of some expert testimony regarding the phenomenon sometimes known as battered women's syndrome and the extent to which that testimony was relevant to issues in this case. I agree that the trial court erred prejudicially when it instructed the jury that the expert testimony could not be considered in determining the objective reasonableness of defendant's belief in the need to use deadly force in defense of self. I write separately, however, to emphasize my disagreement with the broad proposition of the majority that expert testimony regarding battered women's syndrome is "generally relevant" to that issue and therefore admissible without regard to the facts of the particular case or the content of the expert testimony.

I also disagree with the implication in the majority opinion that only the two instructions which the majority consider "appropriate" need be given when expert testimony regarding battered women's syndrome is admitted. If an instruction limiting jury consideration of all or some parts of the expert's relevant testimony regarding battered women's syndrome to a particular issue is requested, the instruction *must* be given. (Evid. Code, § 355;[1] *People* v. *Miranda* (1987) 44 Cal.3d 57, 83 [241 Cal.Rptr. 594, 744 P.2d 1127]. See also 1 Witkin, Cal. Evidence (3d ed. 1986) Circumstantial Evidence, § 313, p. 285.)

Although the majority recognize that all of the expert testimony given here was not relevant to both prongs of perfect self-defense, they fail to

---

[1]All references to statutes are to the Evidence Code.

Section 355: "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request *shall* restrict the evidence to its proper scope and instruct the jury accordingly." (Italics added.)

define or circumscribe the scope of an expert's testimony regarding battered women's syndrome which they hold is "generally relevant" to a defendant's belief that deadly force is necessary in defense of self. They imply that, even though Dr. Bowker's testimony had limited relevance, section 1107 authorized admission of, and jury consideration of, substantially all of his testimony in this case. That is inaccurate. As Justice Brown explains, section 1107 permits admission, when relevant, only of expert testimony "regarding battered women's syndrome, including the physical, emotional, or mental effects upon the beliefs, perceptions, or behavior of victims of domestic violence." Much of Dr. Bowker's testimony was not about battered women's syndrome as such, but was about the experiences of this defendant and recounted the hearsay statements of defendant. That testimony was not made admissible by section 1107 and those hearsay statements were not admissible for their truth. (§§ 801-802.) Under the doctrine of limited admissibility, they were " '*admissible not as independent proof of the facts but as a part of the information upon which the physician based his diagnosis and treatment, if any*. [Citations.] Upon request the jurors should be told . . . that the evidence was received and was to be considered for this narrow and limited purpose.' " (*Whitfield* v. *Roth* (1974) 10 Cal.3d 874, 895, fn. 25 [112 Cal.Rptr. 540, 519 P.2d 588], quoting with approval *Kelley* v. *Bailey* (1961) 189 Cal.App.2d 728, 737-738 [11 Cal.Rptr. 228], italics in original; see also *Korsak* v. *Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1523-1525 [3 Cal.Rptr.2d 833].) Therefore, this part of Dr. Bowker's testimony was not admissible under section 1107, and is not relevant and admissible for either of the purposes suggested in the majority opinion. It may be considered only to explain the basis for his opinion that defendant suffered from battered women's syndrome and, on request, the jury should be so instructed.

Because I agree with Justice Brown as to the limited relevance of expert testimony about battered women's syndrome and of the expert testimony admitted in this case, I cannot join the majority in suggesting that, as a matter of law, expert testimony regarding battered women's syndrome is "generally relevant" to the subjective existence and objective reasonableness of a defendant's belief in the necessity to use deadly force in self-defense. As Justice Brown explains, *some* evidence regarding battered women's syndrome may be relevant in a particular case. And, as is true with all evidence, if an objection is made to introduction of evidence about battered women's syndrome, the proponent of this evidence bears the burden of establishing its particular relevance. (§ 354, subd. (a); *People* v. *Whitt* (1990) 51 Cal.3d 620, 648 [274 Cal.Rptr. 252, 798 P.2d 849].) If the evidence is admitted, the court, on request, *must* give instructions limiting consideration of the evidence to the specific issue or issues to which it is relevant.

**WERDEGAR, J.,** Concurring.—Like Justice Brown, I agree with the majority's general conclusions but believe the instructional question calls for a

more specific analysis of the relationship between expert testimony and a claim of reasonable self-defense. For the reasons explained in Justice Brown's concurring opinion, expert testimony regarding battered woman's syndrome is not relevant to the objective reasonableness of the defendant's belief in the need for self-defense *unless* the defendant's claim of reasonableness is based upon facts that would not, outside of a battering relationship, tend to show the reasonableness of the defendant's belief in the need to use deadly force. (Conc. opn. of Brown, J., *post*, at p. 1098.)

Although not explicitly stated in Justice Brown's opinion, it follows that in cases not meeting this description—cases, that is, in which the claim of reasonable belief is not dependent on expert testimony as to the nature of a battering relationship—a trial court would not err by giving a limiting instruction of the type suggested in *People* v. *Aris* (1989) 215 Cal.App.3d 1178, 1199 [264 Cal.Rptr. 167], and given in the instant case. Nor would a court err in any case by limiting the jury's use of battered woman's syndrome (BWS) evidence on the question of reasonableness to that aspect of the expert testimony actually relating to the reasonableness of the defendant's belief in the need for self-defense.

I part company from Justice Brown insofar as her analysis depends upon Evidence Code section 801. (See conc. opn. of Brown, J., *post*, at p. 1095.) Evidence Code section 1107 declares BWS evidence admissible, when offered by the defense, upon a foundation of relevance and proper qualification of the expert witness. The Legislature has thus commanded BWS be treated as a proper subject for expert testimony, whether or not it would otherwise meet the generally applicable test of Evidence Code section 801.

**BROWN, J.,** Concurring.—For years the lower courts, poised precariously upon the slippery slope of personalized defenses, have tried valiantly not to ski down it. Early cases focused on the general admissibility of evidence of battered woman's syndrome (BWS) to support claims of self-defense. By 1991, with that question answered by legislative fiat, concern shifted to a more nuanced discussion of relevance. Courts found expert testimony admissible to rehabilitate the defendant's credibility and to explain her subjective state of mind, but not relevant to the jury's determination of the objective reasonableness of her actions.

Today we hold that "evidence of battered women's syndrome is generally *relevant* to the reasonableness, as well as the subjective existence, of defendant's belief in the need to defend and, to the extent it is relevant, the jury may *consider* it in deciding both questions." (Maj. opn., *ante*, at pp. 1088-1089.) But, this conclusion only begins, rather than ends, the discussion. As always, the devil is in the details.

Substantial questions remain unresolved: when, to what purpose, and to what extent can expert opinion concerning the defendant's mental state be used to assess the objective reasonableness of a claim of self-defense? If we go too far, accountability—the essential touchstone of the criminal law—is undermined; if we do not go far enough, the defendant is deprived of a defense the jury may find genuine. It is the struggle to find the balance point between accountability and justification that engenders confusion when a victim of battering kills her abuser and seeks to prove her claim of self-defense with BWS evidence.

While I agree with the general conclusions of the majority, concern with the specific application of these principles prompts me to examine more closely the links between the objective component of self-defense and BWS.

### The Law of Self-defense

The statutory basis for self-defense, as described in Penal Code sections 197 and 198, permits killing to prevent great bodily injury or death when there is "reasonable ground" to believe such harm is threatened and "imminent danger" of the threat "being accomplished . . . ." (Pen. Code, § 197.) Nevertheless, "[a] bare fear of the commission of [great bodily injury] is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone." (Pen. Code, § 198.)

Accordingly, "self-defense may be analyzed as having two requirements: (1) the defendant's acts causing the victim's death were motivated by an actual (also referred to as 'genuine' or 'honest') belief or perception that (a) the defendant was in imminent danger of death or great bodily injury from an unlawful attack or threat by the victim and (b) the defendant's acts were necessary to prevent the injury; and (2) a reasonable person in the same circumstances would have had the same perception and done the same acts." (*People* v. *Aris* (1989) 215 Cal.App.3d 1178, 1186 [264 Cal.Rptr. 167].) Or, as reduced to the common shorthand: "self-defense requires both actual subjective belief and objective reasonableness . . . ." (*Ibid.*)

"Justification does not depend upon the existence of actual danger but rather depends upon appearances; it is sufficient that the circumstances be such that a reasonable person would be placed in fear for his safety and that the defendant acted out of that fear. [Citations.]" (*People* v. *Clark* (1982) 130 Cal.App.3d 371, 377 [181 Cal.Rptr. 682].) The defendant may well be mistaken in his assessment of the circumstances; but if reasonably so, he is nevertheless entitled to the defense. (*People* v. *Semone* (1934) 140 Cal.App.

318, 327 [35 P.2d 379]; see *People* v. *Toledo* (1948) 85 Cal.App.2d 577, 580 [193 P.2d 953].) In the words of Justice Holmes, "Detached reflection cannot be demanded in the presence of an uplifted knife." (*Brown* v. *United States* (1921) 256 U.S. 335, 343 [65 L.Ed. 961, 963, 41 S.Ct. 501, 18 A.L.R. 1276].) "In defending himself, however, a person may use only that force which is necessary in view of the nature of the attack . . . . [Citation.]" (*People* v. *Clark, supra*, 130 Cal.App.3d at p. 377.)

The law thus recognizes that the objective component is not measured by an abstract standard of reasonableness but one based on the defendant's perception of imminent harm or death. Because his state of mind is a critical issue, he may explain his actions in light of his knowledge concerning the victim. (*People* v. *Davis* (1965) 63 Cal.2d 648, 656 [47 Cal.Rptr. 801, 408 P.2d 129]; see *People* v. *Lee Chuck* (1887) 74 Cal. 30, 34-35 [15 P. 322].) Antecedent threats as well as the victim's reputation for violence, prior "assaults, and other circumstances [are] relevant to interpreting the attacker's behavior." (*People* v. *Aris, supra*, 215 Cal.App.3d at p. 1189; see *People* v. *Moore* (1954) 43 Cal.2d 517, 527-529 [275 P.2d 485]; *People* v. *Lee Chuck, supra*, 74 Cal. at pp. 34-35; *People* v. *Brophy* (1954) 122 Cal.App.2d 638, 647-648 [265 P.2d 593].) While such considerations alone do not establish a right of self-defense (see *People* v. *Fitch* (1938) 28 Cal.App.2d 31, 45-46 [81 P.2d 1019]), they illuminate and reflect on the reasonableness of defendant's perception of both the imminence of danger and the need to resist with the degree of force applied. (See *People* v. *Moore, supra*, 43 Cal.2d at p. 528.) They may also justify the defendant "in acting more quickly and taking harsher measures for her own protection in the event of assault, whether actual or threatened, than would a person who had not received such threats." (*People* v. *Bush* (1978) 84 Cal.App.3d 294, 302-303 [148 Cal.Rptr. 430].)

Imminence is a critical component of both prongs of self-defense. A previous threat, unaccompanied by any demonstration of an immediate intention and ability to carry it out, will not justify an assault. The defendant is, however, "entitled to corroborate his testimony that he was in [immediate or imminent] fear for his life by proving the reasonableness of such fear" through evidence of "his own frame of mind." (*People* v. *Davis, supra*, 63 Cal.2d at p. 656.) The jury must evaluate such perceptions in context, i.e., the "same or similar circumstances" as those in which the defendant acted. (See *People* v. *Kermott* (1939) 33 Cal.App.2d 236, 242-243 [91 P.2d 215].) Therefore, if they would "induce a well founded belief in the mind of a reasonable person that his adversary was on the eve of executing the threat" and that immediate defense against the impending danger was the only means of escape from great bodily injury or death, the law of self-defense

justifies use of whatever force is necessary to "avert the threatened peril." (*People* v. *Scoggins* (1869) 37 Cal. 676, 683-684; *People* v. *Aris, supra,* 215 Cal.App.3d at pp. 1186-1189.)

### The General Relevance of BWS

Evidence Code section 1107 makes admissible *relevant* expert testimony regarding BWS, "including the physical, emotional, or mental effects upon the beliefs, perceptions, or behavior of victims of domestic violence." The statute further allows that this evidence "shall not be considered a new scientific technique whose reliability is unproven" (Evid. Code, § 1107, subd. (b)), thus legislatively obviating the need to qualify the expert's testimony under the standards of *People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240]. (See *People* v. *Leahy* (1994) 8 Cal.4th 587, 593-604 [34 Cal.Rptr.2d 663, 882 P.2d 321]; but see *Ibn-Tamas* v. *United States* (D.C. 1979) 407 A.2d 626, 655 (dis. opn. of Nebeker, J.); Note, *The Battered Woman Syndrome and Self-Defense: A Legal and Empirical Dissent* (1986) 72 Va. L.Rev. 619, 630-643.) However, since section 1107 does not specifically abrogate Evidence Code section 801, we may assume that section's definition of the foundational prerequisites for expert testimony remains integral to the assessment of relevance. Thus, not only must the proponent establish the expert's qualifications (Evid. Code, § 801, subd. (b); *id.,* § 1107, subd. (b)), the testimony must "[r]elate[] to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (*Id.,* § 801, subd. (a); *People* v. *Cole* (1956) 47 Cal.2d 99, 103-104 [301 P.2d 854, 56 A.L.R.2d 1435].)

With respect to psychological states analogous to BWS, such as rape trauma syndrome and child sexual abuse accommodation syndrome, courts, including this one, have generally held expert opinion admissible for the same general reason defendants proffer testimony on BWS: "to disabus[e] the jury of some widely held misconceptions about [the] victims, so that it may evaluate the evidence free of the constraints of popular myths. [Citations.]" (*People* v. *Bledsoe* (1984) 36 Cal.3d 236, 247-248 [203 Cal.Rptr. 450, 681 P.2d 291] [rape]; *People* v. *Sanchez* (1989) 208 Cal.App.3d 721, 735 [256 Cal.Rptr. 446] [child sexual abuse]; cf. *People* v. *McAlpin* (1991) 53 Cal.3d 1289, 1300-1302 [283 Cal.Rptr. 382, 812 P.2d 563] [expert testimony admissible to dispel misconceptions about reporting of child molestation].) Nevertheless, consistent with the fundamental requisite of relevancy, admissibility is not unqualified. For example, in child molestation cases "the prosecution is obligated to 'identify the myth or misconception the evidence is designed to rebut' and the testimony must be limited to exposing the misconception by explaining why the child's behavior is not

inconsistent with his or her having been abused. [Citation.]" (*People* v. *Bothuel* (1988) 205 Cal.App.3d 581, 587 [252 Cal.Rptr. 596], overruled on other grounds in *People* v. *Scott* (1994) 9 Cal.4th 331, 348 [36 Cal.Rptr.2d 627, 885 P.2d 1040]; *People* v. *Bowker* (1988) 203 Cal.App.3d 385, 394 [249 Cal.Rptr. 886].) The jury should also be given a limiting instruction. (*People* v. *Bergschneider* (1989) 211 Cal.App.3d 144, 159 [259 Cal.Rptr. 219].)

### The Specific Issue of Objective Reasonableness

The foregoing substantivc and evidentiary principles direct the present inquiry: we must identify those aspects of BWS not only sufficiently beyond the ken of the average juror to warrant expert testimony but also specifically relevant to the jury's determination whether the defendant had "a reasonable belief that [she would] lose [her] life or suffer serious bodily injury unless [she] immediately defend[ed] [herself] against the attack of the adversary." (*People* v. *Scoggins, supra*, 37 Cal. at p. 683.)

Despite the extensive and vivid, even lurid, details of battering relationships, the literature and published opinions contain relatively limited discussion, even on an anecdotal basis, of BWS directly relating to objective reasonableness. The single most pertinent aspect, which defendant here invokes, is the hypervigilance generated by the cycles of abuse that mark these relationships. As the commentators explain: "[T]he battered woman's familiarity with her husband's violence may enable her to recognize the subtle signs that usually precede a severe beating. . . . Moreover, even if the woman kills her husband when he is only threatening her, rather than actually beating her, she knows from past experience that he is not merely making idle comments but is fully capable of carrying out his threats. Thus, the battered woman may reasonably fear imminent danger from her husband when others unfamiliar with the history of abuse would not." (Kinports, *Defending Battered Women's Self-Defense Claims* (1988) 67 Or. L.Rev. 393, 423-424, fns. omitted; Crocker, *The Meaning of Equality for Battered Women Who Kill Men in Self-Defense* (1985) 8 Harv. Women's L.J. 121, 141, 143; Walker, *Battered Women Syndrome and Self-Defense* (1992) 6 Notre Dame J.L. Ethics & Pub. Pol'y 321, 324, 328.) "[E]xperts testify that, because a battered woman is attuned to her abuser's pattern of attacks, she learns to recognize subtle gestures or threats that distinguish the severity of attacks and that lead her to believe a particular attack will seriously threaten her survival." (*Developments in the Law—Legal Responses to Domestic Violence* (1993) 106 Harv. L.Rev. 1498, 1582, fn. omitted.)

In a related vein, researchers also note that "[w]hen a woman kills her batterer, the abuse almost always will have escalated both in frequency and

intensity in the period immediately preceding the killing." (Rosen, *On Self-Defense, Imminence, and Women Who Kill Their Batterers* (1993) 71 N.C. L.Rev. 371, 401, fn. omitted; see Walker et al., *Beyond the Juror's Ken: Battered Women* (1982) 7 Vt. L.Rev. 1, 3; Browne, When Battered Women Kill (1987) pp. 68-69, 105-107.) "Expert testimony [shows] that among battered women who kill, the final incident that precipitates the killing is viewed by the battered woman as 'more severe and more life-threatening than prior incidents.' [Citation.]" (*Commonwealth* v. *Stonehouse* (1989) 521 Pa. 41, 63 [555 A.2d 772, 784], fn. omitted.) On the basis of her experience, a battered woman may thus be "better able to predict the likely degree of violence in any particular battering incident" (Ewing, Battered Women Who Kill (1987) p. 55) and in turn may more precisely assess the measure and speed of force necessary to resist. (*People* v. *Aris, supra,* 215 Cal.App.3d at p. 1194.)

Judicial analysis reflects the relevance of BWS to the objective component of self-defense. In *State* v. *Kelly* (1984) 97 N.J. 178, 193 [478 A.2d 364, 371], the trial court had excluded expert evidence on BWS. The New Jersey Supreme Court reversed and observed, "Depending on its content, the expert's testimony might also enable the jury to find that the battered wife, because of the prior beatings, numerous beatings, as often as once a week, for seven years, from the day they were married to the day he died, is particularly able to predict accurately the likely extent of violence in any attack on her. That conclusion could significantly affect the jury's evaluation of the reasonableness of defendant's fear for her life." (478 A.2d at p. 378, fn. omitted; *Robinson* v. *State* (1992) 308 S.C. 74 [417 S.E.2d 88, 91] ["battered women can experience a heightened sense of imminent danger arising from the perpetual terror of physical and mental abuse"].)

In *People* v. *Torres* (1985) 128 Misc.2d 129 [488 N.Y.S.2d 358], the trial court also rejected proffered expert testimony. The reviewing court found error; the evidence was relevant in part because the expert "would testify that a battered woman, through her extensive experience with prolonged physical abuse, learns to distinguish between varying degrees of danger and violence. This expert explanation concerning acute discriminatory powers would provide a basis for the jury to understand how at the time of the shooting [the batterer's] violence had, in the defendant's mind, passed from the 'normal' and tolerable into the 'abnormal' and life-threatening." (488 N.Y.S.2d at p. 362.) By placing the final incidence of abuse in context, the testimony might enlighten the jury's assessment of a reasonable person's perceptions as well. (See also *State* v. *Gallegos* (1986) 104 N.M. 247 [719 P.2d 1268, 1271] ["Incidents of domestic violence tend to follow predictable patterns. Recurring stimuli, such as drunkenness or jealousy, reliably incite

brutal rages. Remarks or gestures which are merely offensive or perhaps even meaningless to the general public may be understood by the abused individual as an affirmation of impending physical abuse."]; *State* v. *Allery* (1984) 101 Wn.2d 591, 597 [682 P.2d 312, 316] ["[E]xpert testimony explaining why a person suffering from [BWS] would . . . fear increased aggression against herself would be helpful to a jury in understanding a phenomenon not within the competence of an ordinary lay person" and also "is central to her claim of self-defense. [Citation.]"].)

There is a clear nexus between the phenomenon of hypervigilance and the objective component of self-defense, i.e., the reasonable fear of imminent injury or death and the perceived need to react with the speed and force used. Under settled principles, if the victim's threats caused the defendant " 'to fear greater peril than she would have had otherwise, [the jury may] take such facts into consideration in determining whether defendant acted in a manner which a reasonable person would act in protecting his or her own life or bodily safety.' " (*People* v. *Moore, supra,* 43 Cal.2d at p. 528.) For the same reasons, the defendant may also be " 'justified in acting more quickly and taking harsher measures for her own protection in event of assault, than would a person who had not received such threats . . . .' " (*Ibid.; People* v. *Bush, supra,* 84 Cal.App.3d at p. 304; *People* v. *Torres* (1949) 94 Cal.App.2d 146, 152-153 [210 P.2d 324].) When antecedent threats have accompanied a recurring cycle of escalating abuse, their relevance to the reasonableness of the defendant's fear of imminent and more serious violence is manifest.

Although relevant to the objective component of self-defense, BWS evidence is necessarily subject to qualifications and limitations when proffered on that issue. Evidence Code section 1107 is "a rule of evidence only"; "no substantive change affecting the Penal Code is intended." (Evid. Code, § 1107, subd. (d).) Expert testimony is therefore not relevant until the defendant puts at issue conduct or circumstances the jury might not otherwise understand as the basis for self-defense, i.e., that absent BWS evidence would not be considered reasonable. (See *Behr* v. *County of Santa Cruz* (1959) 172 Cal.App.2d 697, 709-710 [342 P.2d 987], and cases cited; see also *State* v. *Gallegos, supra,* 719 P.2d at p. 1271; cf. *People* v. *Bothuel, supra,* 205 Cal.App.3d at p. 587.) In many circumstances, BWS will be irrelevant to the question of objective reasonableness because the facts raise a traditional and therefore readily assessable self-defense claim, for example, when the victim threatens or approaches the defendant with a gun or knife or when the two struggle over a weapon following a threat or other hostile act by the victim. In such "classic" confrontations, "[f]ear is a common human emotion within the understanding of a jury and hence expert psychiatric explanation is not necessary. A jury is as capable as [the expert] in determining the ultimate fact in this case whether [the defendant] acted under fear

when she shot her husband." (*State* v. *Griffiths* (1980) 101 Idaho 163, 165 [610 P.2d 522, 524], overruled on other grounds in *State* v. *LePage* (1981) 102 Idaho 387 [630 P.2d 674, 683]; cf. *People* v. *Czahara* (1988) 203 Cal.App.3d 1468, 1478 [250 Cal.Rptr. 836] [whether events would have provoked the ordinary reasonable person to an unreasoning passion "not a subject sufficiently beyond common experience" to warrant expert opinion].)

In other circumstances, however, the situation may be confrontational but lack such overt or obvious potential for serious harm. Nevertheless, in light of her history of battering by the victim, the defendant may anticipate imminent bodily injury or death. Or, following an initial struggle in which she gained a temporary advantage, she may continue to fear the victim because she knows he reacts violently to loss of control or she senses an escalating severity to his violence. "[Where] there has been physical abuse over a long period of time, the circumstances which assist the court in determining the reasonableness of a defendant's fear of death or serious injury at the time of a killing include the defendant's familiarity with the victim's behavior in the past." (*Commonwealth* v. *Stonehouse, supra,* 555 A.2d at p. 781.) "The cyclical nature of an intimate battering relationship enables a battered spouse to become expert at recognizing the warning signs of an impending assault from her partner—signs frequently imperceptible to outsiders. For some victims, the sign may be 'that look in his eye'; for others, it is the advent of heavy drinking, or heightened irrational jealousy." (*Banks* v. *State* (1992) 92 Md.App. 422, 429 [608 A.2d 1249, 1252].)

Although a jury might not find the *appearances* sufficient to provoke a reasonable person's fear, they might conclude otherwise as to a reasonable person's perception of the *reality* when enlightened by expert testimony on the concept of hypervigilance. The expert evidence thus "is aimed at an area where the purported common knowledge of the jury may be very much mistaken, an area where jurors' logic, drawn from their own experience, may lead to a wholly incorrect conclusion, an area where expert knowledge would enable the jurors to disregard their prior conclusions as being common myths rather than common knowledge." (*State* v. *Kelly, supra,* 478 A.2d at p. 378; *Ibn-Tamas* v. *United States, supra,* 407 A.2d at p. 634; *Hawthorne* v. *State* (Fla.Dist.Ct.App. 1982) 408 So.2d 801, 806-807.)

Nevertheless, the expert must not usurp the function of the jury and reach the ultimate question of reasonableness. (See *People* v. *Aris, supra,* 215 Cal.App.3d at pp. 1197-1198.) The concept of hypervigilance is not the evidentiary equivalent of, or substitute for, an actual perception of impending danger, only a possible explanation for the defendant's reaction to a perceived threat. (Cf. *People* v. *Bledsoe, supra,* 36 Cal.3d at pp. 249-251

[rape trauma syndrome evidence admissible to rebut misconceptions about rape victims but not to establish crime occurred].) "Either the jury accepts or rejects that explanation . . . . No expert is needed, . . . once the jury has made up its mind on those issues, to tell the jury the logical conclusion, namely, that a person who has in fact been severely and continuously beaten might very well reasonably fear that the imminent beating she was about to suffer could be either life-threatening or pose a risk of serious injury." (*State v. Kelly, supra,* 478 A.2d at p. 378, fn. omitted.) The determination must remain objective even though the inquiry may be individualized by consideration of BWS.

Finally, since BWS is admissible only narrowly on the issue of objective reasonableness, a limiting instruction is appropriate upon request to "restrict the evidence to its proper scope . . . ." (Evid. Code, § 355; see *Daggett v. Atchison, T. & S.F. Ry. Co.* (1957) 48 Cal.2d 655, 665-666 [313 P.2d 557, 64 A.L.R.2d 1283]; cf. *People v. Bothuel, supra,* 205 Cal.App.3d at p. 589.) In assessing a claim of self-defense the jury must not confuse the question whether a reasonable person in the defendant's circumstances would have perceived a threat of imminent injury or death with the notion that killing the abuser would be a "reasonable," i.e., understandable, response to ongoing physical and psychological abuse. Absent a limitation, the jury may read the instructions to imply a separate standard in BWS cases. While courts in some jurisdictions refer to the "reasonably prudent battered woman," (*Commonwealth v. Stonehouse, supra,* 555 A.2d at p. 784; see also *State v. Kelly, supra,* 478 A.2d at p. 385, fn. 23), California maintains a single standard for all defendants who claim they acted in self-defense. Moreover, the jury must appreciate that opinion testimony is not dispositive but "only to aid in coming to a conclusion, and it does not exclude consideration of other evidence which is pertinent to the issue involved. [Citations.]" (*Neel v. Mannings, Inc.* (1942) 19 Cal.2d 647, 654 [122 P.2d 576].)

### Application to These Facts

Turning to the facts of this case, for the most part defendant's account of events leading to the shooting did not require the filter of an expert's opinion to assist in determining the question of reasonableness. She presented a relatively straightforward claim of self-defense the jury could either accept or reject as such. According to defendant, Hampton had been physically and verbally abusive for most of the year they lived together. His threats and acts of violence had been increasing for several weeks prior to the fateful evening. Although he liked guns and owned several, he had never shot at her until the previous night. On the way home from the mountains the next day, he pointed out what he thought would be a good place to kill her because no

one would find the body for awhile. Just minutes before the shooting with the gun lying within easy reach, he told her "[t]his time" he would not miss. She then grabbed the weapon as he appeared about to do the same. While she was holding him at bay, he reached for her arm at which point she apparently shot him. On their face, nothing in these facts lies beyond the experience of the average reasonable person or the ken of the average juror. (See *State* v. *Griffiths*, *supra*, 610 P.2d at p. 524.)

At the same time, defendant also testified to facts implicating characteristics of BWS that correspond to the objective element of self-defense. Consistent with his threats, Hampton began hitting her more frequently when he got off parole. The night before, he was "getting crazy" asking for the gun, which he then shot in her direction narrowly missing her. At that moment, he had a "look on his face" that defendant had seen before "but not this bad"; he "wasn't the same person." As to events surrounding Hampton's death, defendant related that shortly before she grabbed the gun, the two were screaming and arguing; "then all of a sudden, he got quiet for a minute or two, and, then, he just snapped." A few moments later, he moved from the kitchen toward the gun saying, "This time, bitch, when I shoot at you, I won't miss." At this point, she "knew he would shoot me" and was "scared to death" not only because of Hampton's threats and prior violence but also because of his "very, very heavy" walk indicating he was "mad." She had no doubt he would kill her if she did not kill him first. As they confronted each other in the kitchen, he "looked crazy." She assumed he was going for the gun when he reached for her arm and shot him.

As relevant to this testimony, Dr. Bowker explained generally that with the cycles of violence typifying BWS the "severity tends to escalate over time." Battered women develop a heightened awareness of this escalation as threats and physical abuse become increasingly menacing. A sense of the batterer's omnipotence due to his dominance may augment this hypervigilance, causing the woman to believe all the more he will act on his threats of violence.

Bowker also discussed some specifics arguably relating to defendant's objective perception of imminent harm: "[T]he escalation had been such, particularly the night before, where [Hampton] actually shot at her that it would be pretty hard to doubt the seriousness." "A difference, I think, [between Hampton's last threat and previous ones] is that [defendant] felt for the first time that he really intended to do it and, you know, my experience with battered women who kill in self-defense their abusers, it's always related to their perceived change of what's going on in a relationship. They become very sensitive to what sets off batterers. They watch for this stuff very carefully. [¶] Anybody who is abused over a period of time becomes

sensitive to the abuser's behavior and when she sees a change acceleration begin in that behavior, it tells them something is going to happen and usually the abuser said things specifically like 'I'm really going to kill you this time,' and, you know, they don't admit to that something happens that there's a label put on it by the abuser which was certainly true in Albert's case and that's intensification or an acceleration of the process is what leads to some self-defensive action which is beyond anything that the woman has ever done before."

This testimony could assist the jury in determining whether a reasonable person in defendant's situation would have perceived from the totality of the circumstances imminent peril of serious bodily injury or death. Absent the expert's explanation, the average juror might be unduly skeptical that a look, footstep, or tone of voice could in fact signal impending grave harm or that a reasonable person would be able accurately to assess the need to take self-defensive action on that basis. (*State* v. *Kelly, supra,* 478 A.2d at p. 378.) Accordingly, the trial court erred in categorically precluding consideration of evidence relevant to this purpose rather than giving a properly worded limiting instruction.

### Prejudice

Notwithstanding the error, the question of prejudice is extremely close given the "miscarriage of justice" standard of review. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The faulty instruction precluded the jury from considering BWS in assessing defendant's objective reasonableness. But such evidence could not be considered in a vacuum; it was relevant only to the extent it shed light on the reality of her perceptions. The pertinent inquiry therefore is whether the jury would have discounted any of defendant's testimony in the absence of expert BWS evidence explaining it in that context.

As previously recounted, although defendant in many respects presented a traditional claim of self-defense independent of BWS, she also testified to circumstances that but for such evidence might not appear relevant to the objective component. Impliedly directed to disregard Bowker's testimony that a battered woman "becomes sensitive to the abuser's behavior," the jury might not consider whether a reasonable person in defendant's position would have perceived from Hampton's "very, very heavy" walk or his "crazy" look an imminent attack or the need to react with deadly force. While not emphasizing the erroneous instruction, the prosecutor did note it to the jury. He argued defendant did not react reasonably by grabbing the gun in response to Hampton's "[t]his time" threat because the remark was "like so many threats before" and could not be taken seriously, and she had

no reason to feel threatened "once she got the gun." The prosecutor also questioned whether defendant could detect any difference in Hampton's walk.

Other considerations tend to negate prejudice. Defendant made several inconsistent statements to the police shortly after the shooting that undermined her defense. In arguing against a finding of self-defense, the prosecutor did not substantially exploit any circumstances that hypervigilance would have explained as reasonable. Moreover, the instructions included CALJIC No. 5.50 (5th ed. 1988 bound vol.),[1] which afforded an adequate basis for finding self-defense if the jury believed defendant's account.

On balance, however, the scales tip marginally in defendant's favor in light of her limited burden of proof. Defendant does not have to prove the homicide was justified; she merely has to raise a reasonable doubt that it might have been. (*People* v. *Pineiro* (1982) 129 Cal.App.3d 915, 921 [179 Cal.Rptr. 883]; *People* v. *Banks* (1976) 67 Cal.App.3d 379, 384 [137 Cal.Rptr. 652]; CALJIC No. 5.15.)

George, C. J., and Baxter, J., concurred.

---

[1]CALJIC No. 5.50 provides: "A person threatened with an attack that justifies the exercise of the right of self-defense need not retreat. In the exercise of [her] right of self-defense such person may stand [her] ground and defend [herself] by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar knowledge; and such person may pursue such assailant until [she] has secured [herself] from the danger if that course likewise appears reasonably necessary. This law applies even though the assailed person might more easily have gained safety by flight or by withdrawing from the scene."

Defendant failed to request CALJIC No. 5.51 (5th ed. 1988 bound vol.): "Actual danger is not necessary to justify self-defense. If one is confronted by the appearance of danger which arouses in [his] [her] mind, as a reasonable person, an honest conviction and fear that [he] [she] is about to suffer bodily injury, and if a reasonable person in a like situation, seeing and knowing the same facts, would be justified in believing [himself] [herself] in like danger, and if that individual so confronted acts in self-defense upon such appearances and from such fear and honest convictions, such person's right of self-defense is the same whether such danger is real or merely apparent." Nor did she ask for an instruction explaining that threats may justify the defendant "in acting more quickly and taking harsher measures for her own protection in the event of assault, whether actual or threatened, than would a person who had not received such threats." (*People* v. *Bush*, *supra*, 84 Cal.App.3d at p. 303.)