Filed 3/5/14  P. v. Matheson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Tehama)

----

| | |
|---|---|
| THE PEOPLE, | C072351 |
| Plaintiff and Respondent, | (Super. Ct. No. NCR82101) |
| v. | |
| TROY MATHESON, | |
| Defendant and Appellant. | |

Thirty-one-year-old defendant Troy Matheson was tried for the first degree murder of his thirty-five-year-old brother Ronnie Matheson (Ronnie).  A jury found defendant guilty of voluntary manslaughter, after telling the court it was having trouble deciding between second degree murder and voluntary manslaughter.  The court sentenced him to seven years in prison.

Before trial, the court ruled that defendant could not present expert witness testimony regarding the effects of Ronnie abusing defendant and their family because the evidence was inadmissible under Evidence Code section 1107, which allows for expert

1

witness testimony on intimate partner battering.[1]  The court expressly stated it was excluding the evidence based on its finding that the evidence did not qualify under Evidence Code section 1107.

On appeal, defendant contends the trial court violated his constitutional right to present a complete defense when it excluded this expert testimony regarding the effect of Ronnie's abuse of defendant and their family and that any error in failing to preserve the issue was ineffective assistance by defense counsel.

We hold that defendant forfeited his constitutional contention by failing to secure a ruling from the trial court on this theory and another theory he had raised for the admissibility of this evidence (social framework testimony).  We further hold that defense counsel was not ineffective for failing to secure these rulings or for failing to seek admission of the testimony on other grounds.  As we explain, defendant was not prejudiced by counsel's omissions.  The evidence that Ronnie abused defendant and their family was already before the jury as was the evidence of the psychological effects of that abuse.  Further, the instructions told the jury it could consider Ronnie's abuse in deciding whether defendant's conduct and beliefs were reasonable, which went to whether defendant was justified in killing Ronnie.  Finally, the jury appeared not to be focused on whether the killing was justified but rather on whether the killing was murder or manslaughter.

---

[1]  Evidence Code section 1107, subdivision (a) provides as follows:  "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge."

# FACTUAL AND PROCEDURAL BACKGROUND

## A

### *The Prosecution's Case*

On July 3, 2011, a group of defendant's family members had gone to the fairgrounds to watch fireworks in Anderson. The group included defendant; his girlfriend; his daughter; Ronnie; one of their sisters, Ronnda Wooden (Ronnda); and Ronnda's husband, George Samuel Wooden (Sam). They were all having a good time, and some were drinking alcohol.

After the fireworks, defendant drove his girlfriend and daughter back to the Live Oak Road home that he shared on weekends with Ronnie. Defendant cooked his girlfriend and daughter something to eat, and then the three of them went to sleep in one of the bedrooms.

Ronnda and Sam then drove a "very intoxicated" Ronnie back to the same house. Upon seeing the kitchen, Ronnie became angry that there was a "big mess" and said that "[defendant] needed to clean it up." Ronnie awoke a sleeping defendant in the bedroom, swore at him, and told him he was disrespecting him and needed to clean up the mess. Ronnie and defendant began fist fighting. Ronnda made defendant's girlfriend and daughter leave the room and then Ronnda and Sam separated the brothers. Sam followed defendant into the kitchen while Ronnda tried to help Ronnie to his bedroom.

Defendant got a knife from the kitchen and walked back down the hallway to the bedrooms, saying he "was protecting his family." Sam tried to hold defendant back with his hands, but defendant pushed Sam out of the way and said, " 'get the fuck out of my way or I'll kill you too.' " Ronnda, who was still in the process of escorting Ronnie to his bedroom, noticed something in defendant's hand, so she crouched down. Defendant then stabbed Ronnie twice, once on his arm and once on his back. Ronnda did not see Ronnie trying to hit defendant when the stabbing occurred. Ronnie stumbled back and told Ronnda to call 911, which she did.

Ronnda tended to Ronnie's wounds in the entryway while she and Ronnie waited for the ambulance. Defendant then charged at Ronnie, knocking him to the ground. Defendant told him, " 'I'm going to kill you' " and " 'fucking die, you worthless piece of shit.' " Ronnie was "knocked out" and "making this . . . gurgling noise." Ronnda got between the brothers and told defendant to leave, which he did.

Police took Ronnie to the hospital where he died from blood loss caused by the stab wound to his back that had punctured his lung and the pericardium around the heart.

Police stopped defendant as he was driving away from the house. Defendant said he had been awakened by his brother punching him. He fought back, then retrieved a knife, stabbed his brother in the shoulder, and then "punched him one more time in the face" because "he was pissed off at all of the times his brother picked on him."

The following morning, police took defendant to the police station to interview him. Defendant said he grabbed the knife to go in the bedroom and get his daughter and when he did, Ronnie was "acting up again ready to swing on [him] and that's when [he] stabbed [Ronnie.]" When defendant went to retrieve the knife, he thought his girlfriend was not in the room and he was not sure if his daughter was. Defendant "was pissed at [Ronnie for] being so fucking physical." Defendant went back and hit Ronnie because of "childhood . . . memories" that included Ronnie punching him without provocation.

B

*The Defense*

Defendant lived in the Live Oak Road home with Ronnie on the weekends and with a roommate in a different house on the weekdays, but defendant was planning on moving out altogether because he and Ronnie had "got[ten] into numerous heated altercations" and defendant "figured [he] needed to separate from [Ronnie] . . . so it didn't come to violence."

On the night defendant killed Ronnie, Ronnie came into defendant's bedroom and yelled at him about leaving the eggs out. Defendant got out of bed, approached Ronnie,

4

and said, " 'Seriously?' " Ronnie responded that he was sick of defendant disrespecting him and then hit defendant. The brothers started fist fighting and defendant told his girlfriend to grab his daughter. Defendant then grabbed Ronnie and asked Ronnie why he was doing this. Ronnie gave him "the angry face," the one showing he was mad at defendant. Ronnie broke free of defendant and then punched defendant in the temple. Reeling from the punch, defendant ran into Sam, who was now in the bedroom, and defendant ran out. Defendant looked around for his daughter but could not see her. He began to panic, thinking she might still be in the room, so he "grabbed the knife for protection." He "fear[ed] that [Ronnie] would grab [defendant's daughter] in order to get to [defendant]." When defendant went back into the bedroom, he "pushed on Sam's left shoulder to locate [his] daughter in the room [and] was hit by Ronnie."[2] Defendant reacted by stabbing Ronnie in the shoulder. When Ronnie was on the front porch being aided by Ronnda, defendant hit Ronnie two more times "because of childhood memories" that included Ronnie repeatedly sucker punching him.

Defendant also presented detailed testimony from his mother, his sister Jolene Matheson (Jolene), and himself about the abuse Ronnie had perpetrated on the family and the effects of that abuse.[3]

---

[2] Defendant's daughter had already come out of the room, but defendant did not know that at the time.

[3] We explain this testimony in detail in part II of the discussion.

DISCUSSION

I

*Defendant Has Forfeited His Contention Relating To The Admissibility Of The Expert*

*Testimony By Failing To Secure A Ruling From The Trial Court*

*On The Theories He Advances In The Appellate Court*

Defendant contends the court violated his constitutional right to present a complete defense when it excluded the expert testimony. He argues that the expert testimony was admissible to assist the jury in evaluating the facts from defendant's perspective. Defendant has forfeited this argument by not raising it in the trial court.

A

*Facts Leading Up To The Trial Court's Ruling Excluding The*

*Expert Testimony And The Trial Court's Ruling*

In seeking to introduce the expert testimony, defense counsel filed a two-page "offer of proof regarding testimony of defense expert." (Capitalization omitted.) In it, he argued "[d]efendants are entitled to present a defense to the charges against them at trial," this includes affirmative defenses, and "without the assistance and testimony of his expert witness," defendant "will have no means of establishing his affirmative defenses," which here included lawful self-defense and defense of others. Defense counsel referred to the expert witness's family violence assessment for defendant.

The assessment was based on a review of the murder, interviews with defendant and his family members, and the expert's recounting of the effects of domestic violence on children and families and the coercive control an abuser has on the abused. The assessment also contained a discussion of Evidence Code section 1107 regarding the admissibility of expert evidence regarding intimate partner battering and why Ronnie's abuse of defendant qualified as intimate partner battering.

Thereafter, the prosecutor filed an in limine motion to exclude the expert testimony, arguing that it did not qualify as intimate partner battering and in any event it

6

was excludable under Evidence Code section 352 because there was no evidence to support a theory that defendant killed Ronnie in self-defense or defense of others. The prosecutor further argued that if the court did allow the testimony, the expert could not give her opinion about defendant's actual state of mind, could not testify defendant's actions were reasonable, and could not testify about inadmissible hearsay.

After reviewing these pleadings, the court ordered the parties to file further pleadings on whether the expert testimony fit within Evidence Code section 1107. In response, the prosecutor filed a short brief arguing a "brotherly relationship" did not qualify. Defense counsel filed a brief arguing that it did, and that if it did not then the evidence was admissible under the category of " 'social frame work [*sic*] testimony.' " Defense counsel further argued that so long as there was evidence from which a jury could infer that the lesser included offense of voluntary manslaughter was committed, whether based on heat of passion or imperfect self-defense, the court had to instruct on voluntary manslaughter.

The court then held a hearing on the admissibility of the expert testimony and had a lengthy discussion with the parties on Evidence Code section 1107. The court prefaced its ruling by stating, "[t]he sole question before me is, does [section] 1107 allow the brother of the victim to present the intimate partner battering defense identified by that section?" The court then ruled it "does not believe that Evidence Code section 1107 applies to a brother" and the expert testimony could not "be used by the defendant under the authority of Evidence Code section 1107."

## B

### *Defendant Has Forfeited His Issues Relating To*
### *The Admissibility Of The Expert Witness Testimony*

On appeal, defendant does not contend that the expert testimony was admissible under Evidence Code section 1107. Rather, he argues the expert witness testimony was admissible to assist the jury in evaluating the facts from his perspective, which he raised

7

in his "supplemental briefing" to the trial court as " 'social frame work [*sic*] testimony.' " Defendant has forfeited this contention and his constitutional contention by failing to secure a ruling on them from the trial court.

When a defendant raises an issue in the trial court, but the trial court does not rule on the issue, it is the defendant's obligation "to press for such a ruling and to object . . . until he obtain[s] one." (*People v. Morris* (1991) 53 Cal.3d 152, 195, disapproved on another point in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) When a defendant fails to press for such a ruling, he "depriv[es] the trial court of the opportunity to correct potential error." (*Morris*, at p. 195.)

That is what happened here. In his first motion, defense counsel raised the issue of defendant's right to present a defense through the testimony of the expert, arguing "[d]efendants are entitled to present a defense to the charges against them at trial," and "without the assistance and testimony of his expert witness," defendant "will have no means of establishing his affirmative defenses," which here included lawful self-defense and defense of others. In his supplemental briefing, defendant added the argument that the expert testimony was admissible under the category of " 'social frame work [*sic*] testimony.' " However, when it came time for the hearing on these matters, the court stated the sole question before it was whether the evidence was admissible under Evidence Code section 1107 regarding intimate partner battering and then proceeded to exclude the evidence after considering that code section only. At no point did defense counsel mention that he had raised an alternative theory of admissibility (the social framework theory) or that the court's ruling excluding the evidence deprived defendant of his constitutional right to present a defense. In failing to do so, defense counsel forfeited these arguments on appeal. (*People v. Morris*, *supra*, 53 Cal.3d at p. 195; *In re Sheena K.* (2007) 40 Cal.4th 875, 880, fn. 1 ["correct term is 'forfeiture' rather than 'waiver' "].)

## II

### *Defense Counsel Was Not Ineffective*

Defendant contends his trial counsel was ineffective for failing to press for rulings on the admissibility of the expert witness testimony under the social framework theory and a constitutional theory and for failing to seek admission of this testimony under Evidence Code section 801, which pertains to the admissibility of expert testimony. As we explain, we disagree that trial counsel was ineffective because his conduct did not prejudice defendant. (See *People v. Waidla* (2000) 22 Cal.4th 690, 718 [deficient performance is the first prong of an ineffective assistance of counsel analysis and prejudice is the second].)[4] The evidence that Ronnie abused defendant and their family and the evidence of the psychological effects of that abuse was already before the jury, the instructions told the jury it could consider Ronnie's abuse in deciding whether defendant's conduct and beliefs were reasonable, and the jury appeared not to be focused on whether the killing was justified but rather on whether the killing was murder or manslaughter.

In defense counsel's initial motion to the court, he stated that "without the assistance and testimony of his expert witness," defendant "will have no means of establishing his affirmative defenses," which here included lawful self-defense and defense of others. This turned out not to be true. At trial, defendant was able to present testimony through his mother, his sister Jolene, and himself that Ronnie engaged in a pattern of physical abuse against defendant and other family members that started when the boys were young.

Their mother testified that when her husband left the family, Ronnie became the father figure and would "hit [defendant] for no reason." Ronnie wanted to "put down his

---

**4**      Here, we do not need to analyze whether defense counsel's performance was deficient, because it was not prejudicial.

rules and his regulations as to how [to] run a family and . . . it would be done his way." "[H]e had like this bipolar grandiosity, this anger issue, and he tried to self medicate it with marijuana and alcohol." "He has always threatened somebody, depend[ing] on what kind of mood he is in." "Sometimes he can be the sweetest person in the world . . . . But if things go the wrong way on him, he can get very violent and very angry and relentless until he gets his answer or whatever he is trying to prove he wants. . . ." Once, Ronnie threw hot vegetables at her because "they were cooked wrong." About one month before defendant killed Ronnie, Ronnie was physically violent with her. Ronnie asked their mother how to spell red and instead (as a joke) she spelled blue. Ronnie came at her with a chair, grabbed her glasses from her face, and when defendant tried to protect their mother, Ronnie said, " 'Fuck that, I am going to kill her' " and came at her again with the chair until defendant was able to help their mother get away.

Their sister Jolene, who was three years younger than defendant, knew Ronnie to be "very hot tempered." When they were young, Ronnie would "raise his fist first" at defendant, but defendant would walk away from it. "Ronnie's thing" when the brothers were fighting was "chok[ing] people out." She had seen Ronnie "choke [defendant] out a few times."

Defendant was afraid of his brother because he had done "bad" things to him and "even worse" things to others. As a child, defendant "got a lot of abuse from him." Ronnie would trip defendant, causing him to fall on his face. Ronnie would kick defendant in the shin with a steel-toed boot. As an adult, once Ronnie "busted out the back window" of a car where defendant was sitting. He had moved to the Live Oak home with Ronnie because he loved his brother and wanted to give him more chances.

Based partly on this evidence, the court instructed the jury that the homicide was justified if done for either self-defense or defense of another. Defendant had to reasonably believe that the immediate use of deadly force was necessary to defend against the imminent danger of being killed or suffering great bodily injury or the

10

imminent "danger of being physically accosted or injured." "If you find that Ronnie Matheson threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable." "Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self[-]defense measures against that person."

What the expert witness testimony would have addressed (as reflected in the assessment) was the psychological explanation of the effects of Ronnie's behavior on his victims, i.e., that Ronnie had "achieved dominance through his bullying tactics," that all of the incidents of abuse Ronnie perpetrated were a "pattern of coercive control," and that victims such as defendant exhibit a " 'paradoxical attachment' " to their abuser. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1086 [an expert witness can testify as to the effects of the batterer's behavior on the victim].)

But the jury had already heard similar testimony. As to achieving dominance through bullying tactics and the pattern of control, Ronnie became the father figure of the household and wanted to "put down his rules and his regulations as to how [to] run a family and . . . it would be done his way." "He has always threatened somebody, depend[ing] on what kind of mood he is in." As to the paradoxical attachment, defendant testified he had moved to the Live Oak Road home with Ronnie because he loved his brother and wanted to give him more chances. Defendant provides us no reason to believe that the jury would have viewed the evidence of the psychological effects of Ronnie's behavior differently had it come from the expert.

Finally, and importantly, it appears the jury was not focused on acquittal as a realistic possibility. When the jury was having difficulty reaching a verdict, it told the court it was split between second degree murder and voluntary manslaughter. Defendant's reasonable belief in the need to defend himself or his daughter, which is at what the expert's testimony would have been directed, was relevant to determine whether the killing was justified, not as a distinguishing factor between murder and manslaughter.

11

For these reasons, defendant was not prejudiced by defense counsel's failing to press for rulings on the admissibility of the expert witness testimony under the social framework theory and a constitutional theory and for failing to seek admission of this testimony under Evidence Code section 801 pertaining to expert testimony.

DISPOSITION

The judgment is affirmed.

<u>     ROBIE     </u>, Acting P. J.

We concur:

<u>     BUTZ     </u>, J.

<u>     MAURO     </u>, J.