Filed 6/12/14  P. v. Delpalacio CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE CARLOS DELPALACIO,<br><br>    Defendant and Appellant. | A136148<br><br>(Sonoma County<br>Super. Ct. No. SCR605144) |

Jose Carlos Delpalacio was convicted by a jury of burglary, assault with a firearm, and being a felon in possession of a gun.  He seeks reversal of his conviction on the ground that the trial court refused to give requested jury instructions on self-defense or defense of others.  We find no substantial evidence to support the requested instructions.  Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Delpalacio was charged, by information, with one count of burglary (Pen. Code, § 459; count 1),[1] one count of assault with a firearm (§ 245, subd. (a)(2); count 2), and one count of being a felon in possession of a gun (former § 12021, subd. (a)(1); count 3).  Count 1 further alleged personal use of a handgun (former § 12022.53, subd. (b)).  Count 2 also alleged personal use of a firearm (former § 12022.5, subd. (a)).  Two prior

---

[1] All further undesignated statutory references are to the Penal Code.

1

strike allegations (§ 1170.12) were included, along with a prior serious felony (§ 667, subd. (a)(1)) and prior prison conviction (§ 667.5, subd. (b)).

*Prosecution Case*

Matthew H.'s Testimony

In July 2011, Matthew H. was living in a one-bedroom apartment in Rohnert Park with his two younger children, Matthew Jr., age 6, and Marcus, age 5. His two stepchildren, Angelina, age 10, and Eric, age 12, lived there on and off. About once a week Matthew's estranged wife, Connie H., spent the night at his apartment so that all four children could be together.[2] Matthew and Connie are legally separated and in the process of getting divorced. At the time, Connie was dating Delpalacio.

Late in the evening on July 15, 2011, Connie came to Matthew's apartment. Matthew was not expecting Connie and had already gone to bed. Connie asked if she could spend the night. Matthew agreed and went back to bed. Connie and the children slept in the living room.

Around 4:00 a.m., Matthew was awakened by a "real loud" banging on the door. He did not hear anyone at the door say anything. He got up and began to get dressed to see what was going on. Intending to protect himself and his family, Matthew went to a safe in the bedroom, removed a .38-caliber handgun, and started to load it. He heard the sound of the front door being kicked down. He turned around and saw a gun pointed at his head. The gun was about six inches from Matthew's face, and he was afraid that he was going to be shot.

Matthew "heard a bunch of just rambling" and he continued to load his gun. Matthew testified that he "[f]inished loading it, and closed it, and . . . aimed it at

---

[2] Because Matthew and Connie share the same last name, we refer to each by first name only. No disrespect is intended.

[Delpalacio], too."[3]  Connie and their children were standing right behind Delpalacio. Matthew heard yelling but it "all happened so fast" that he had no clear memory of what was said.  Connie convinced Delpalacio to go outside.  Matthew testified, "[S]he got between us or something, and she pulled [Delpalacio] outside."

Matthew followed them to the threshold and fired two shots in the air.  Matthew was concerned about his children and wanted to make sure that Connie and Delpalacio left.  Connie and Delpalacio jumped in a white Nissan Maxima sedan and drove off.

Eric called 911 and Matthew spoke to the operator.  A recording of the call was played at trial.  During the call, Matthew gave conflicting accounts as to the shots fired. In one instance, he claimed he "just shot in the air."  But, he earlier reported, "I just shot at the guy."  The police arrived shortly after the call was placed.  Matthew thought they acted as if he were the wrongdoer.[4]

On a previous occasion, July 4, 2010, Matthew confronted Delpalacio when he saw him in Connie's car.[5]  Matthew and Delpalacio fought.  Matthew's antipathy for Delpalacio was not because Matthew wanted to reconcile with Connie, but rather, he did not like Delpalacio's relationship with their children.  Matthew also was angry because Connie spent so much of his money.

---

[3] At trial, Matthew testified that he did not know who was holding the gun.  He explained that he was not wearing his glasses and did not get a good look at the man's face.  He may have previously identified Delpalacio because "[he] didn't like [Delpalacio] as it was."  However, it was undisputed that Delpalacio was, in fact, the person who forced his way into the apartment that evening.

[4] On cross-examination, Matthew acknowledged that he "might have" told the dispatcher he "shot at the guy" and asked the dispatcher whether he was going to be in trouble.  He believed that police officers in Sonoma County would be prejudiced against him because he is African American.  Matthew did not like cooperating with the police and appeared in court only because he was served with a subpoena.

[5] Although Connie drove the car, Matthew paid for it and for the insurance.

3

<u>Eric's Testimony</u> [6]

On July 15, 2011, Eric was asleep on the living room couch at his stepfather's apartment in Rohnert Park. His mother, stepfather, and three siblings were also there. Eric did not recall that his mother and stepfather argued that evening. Eric was awakened by a loud banging on the door. His mother got up and then backed away from the door. Delpalacio kicked open the door and walked into the apartment.

Delpalacio appeared angry. He had a small, silver derringer in his hand.[7] Delpalacio said something to Connie and then walked "straight into" Matthew's room. Matthew was standing in the bathroom. The bathroom door was open and Eric could see Matthew from where he lay on the couch. Delpalacio pointed the gun at Matthew's head. Delpalacio was approximately three or four feet from Matthew.

Matthew said, "Not in front of my kids, not in front of my kids." And then, after Delpalacio put the gun to Matthew's head, Matthew pulled out a gun. Connie then told Delpalacio to go outside, and he did. Eric testified that he and his siblings continued to lay on the couch and the floor during the incident. Delpalacio and Connie went downstairs, and Matthew went to the door and fired two shots into the air. Matthew then called 911.

<u>Connie's Testimony</u>

Connie testified she and Matthew separated in April 2010. She then began dating Delpalacio. Connie was upset that she had been subpoenaed to testify. It was difficult for her to testify because she loves Delpalacio. She told Delpalacio that she would do "whatever she had to do to help him."

Connie lived with Delpalacio for about a year, in Guerneville or Rio Nido, and the children went "back and forth" between her home and Matthew's apartment. Eventually the children stayed mostly with her. Sometimes Matthew told her that, if she wanted to

---

[6] A police officer told Eric that if he did not come to court his parents would go to jail, and Eric would go to juvenile hall.

[7] Eric had seen the gun before at Delpalacio's mother's home.

see the children, she would have to come to his apartment because Matthew did not like Delpalacio. Connie periodically spent the night at Matthew's apartment so that all the children could be together. They would watch movies, and she and Matthew would discuss the children's schedules. Matthew wanted to get back together with Connie and brought it up frequently. Matthew called her so often that "[she] would change [her] number, or . . . hang up the phone, or just turn it off."

On July 15, 2011, Connie came to Matthew's apartment to see the children.[8] Although Connie had intended to return to Delpalacio's house in Rio Nido that evening, she spent the night with her children because she "felt guilty." She and the children were asleep in the living room when she heard Delpalacio knock on the door. As the door was opened, it was damaged.[9]

Delpalacio walked past Connie, and Matthew came in the room and argued with him. Connie did not see Delpalacio with a weapon. She was "in shock" and "[a]ll [her] focus was . . . to get him and go home with him." She grabbed Delpalacio's arm and said, "Let's leave" or "Let's go home." They left the apartment and, after they went down the stairs, she heard one or two gunshots. Connie and Delpalacio got into his car and started to drive home. She did not see a gun in the car.

On cross-examination, Connie testified that Matthew hated Delpalacio. Matthew had difficulty accepting their separation and divorce and he continually talked about getting back together. Connie quickly got Delpalacio out of the apartment because she did not want Matthew to do "something bad" to him.

---

[8] At the time, Connie and Delpalacio "were having . . . problems" and took "a little space." However, they did not break up and continued to live together.

[9] Connie was not crying out for help. She did not need any help. She did not call Delpalacio earlier that evening asking him to come and save her. Nor did she leave him instructions to come to her aid. She testified, however, "[H]e was worried when I went over there. . . . [S]o I didn't come home that night, so he was probably worried about me." Delpalacio did not leave her any voicemails that night.

Rohnert Park Police Sergeant David Welch's Testimony

Around 4:30 a.m. on July 15, Welch was dispatched to the apartment based on a report of shots fired. Welch was also told a woman had been kidnapped at gunpoint. Matthew described a silver-colored derringer and identified the suspect as his ex-wife's boyfriend, "Jose."

Welch requested dispatchers broadcast a description of the suspect's vehicle. Welch then went into Matthew's apartment and observed that the door frame was dislodged from the wall, Sheetrock was torn off around the frame, and the strike plates were laying inside the apartment. The dead bolt was still in a locked position.

Sonoma State University Police Officer Karl Mortenson's Testimony

Around 4:30 a.m. that same morning, Mortenson received a broadcast about persons in a white Nissan Maxima being involved in a shooting and possible kidnapping. Mortenson saw a car matching that description and made a traffic stop. Delpalacio was driving the vehicle, and Connie was in the passenger seat. A silver derringer pistol was found inside the dashboard console. The pistol was loaded with one live round and one spent round. The gun appeared to be operable. When stopped, Delpalacio was driving in the opposite direction of Rio Nido.

*Instructions and Verdict*

The trial court denied Delpalacio's request for instructions on self-defense, defense of others, antecedent threats, and a felon's possession of a firearm in self-defense. The court explained: "[T]he Court believes that, when the defendant is going to rely on an affirmative defense, that there has to be substantial evidence to support the defense in order for the instructions to be given. . . . [¶] . . . [¶] And the Court does not believe that there's sufficient, substantial evidence to support the affirmative defense . . . ."

After closing arguments in which defense counsel argued that Delpalacio did not intend to commit an assault but, rather, "went to get his girlfriend back," the jury returned guilty verdicts on all counts and found the personal use allegations true. At sentencing,

the trial court exercised its discretion to strike one of Delpalacio's prior strikes, pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, and sentenced Delpalacio to a total term of 28 years. Delpalacio filed a timely notice of appeal.

## II. DISCUSSION

Delpalacio contends that the trial court's refusal to give his proposed instructions on self-defense and defense of others, antecedent threats (CALCRIM No. 3470),[10] and

---

[10] CALCRIM No. 3470 states: "Self-defense is a defense to _____ *<insert list of pertinent crimes charged>*. The defendant is not guilty of (that/those crime[s]) if (he/she) used force against the other person in lawful (self-defense/ [or] defense of another). The defendant acted in lawful (self-defense/ [or] defense of another) if: [¶] 1. The defendant reasonably believed that (he/she/ [or] someone else/ [or] _____ *<insert name of third party>*) was in imminent danger of suffering bodily injury [or was in imminent danger of being touched unlawfully]; [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was (imminent danger of bodily injury to (himself/herself/ [or] someone else)/[or] an imminent danger that (he/she/[or] someone else) would be touched unlawfully). Defendant's belief must have been reasonable and (he/she) must have acted because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful (self-defense/ [or] defense of another). [¶] When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] [The slightest touching can be unlawful if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind.] [¶] [The defendant's belief that (he/she/ [or] someone else) was threatened may be reasonable even if (he/she) relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true.] [¶] [If you find that _____ *<insert name of victim>* threatened or harmed the defendant [or others] in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.] [¶] [Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person.] [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the defendant

7

self-defense in the context of possession of a firearm by a felon (CALCRIM No. 2514)[11] violated his rights to due process and a fair trial.  We disagree.

---

did not act in lawful (self-defense/ [or] defense of another).  If the People have not met this burden, you must find the defendant not guilty of _____ *<insert crime(s) charged>*."

[11] CALCRIM No. 2514 provides:  "The defendant is not guilty of unlawful possession of a firearm . . . if (he/she) temporarily possessed the firearm in (self-defense/ [or] defense of another).  The defendant possessed the firearm in lawful (self-defense/ [or] defense of another) if:  [¶] 1. The defendant reasonably believed that (he/she/someone else/ _____ *<insert name of third party>*) was in imminent danger of suffering great bodily injury;  [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger;  [¶] 3. A firearm became available to the defendant without planning or preparation on (his/her) part;  [¶] 4. The defendant possessed the firearm temporarily, that is, for a period no longer than was necessary [or reasonably appeared to have been necessary] for self-defense;  [¶] 5. No other means of avoiding the danger of injury was available;  [¶] AND [¶] 6. The defendant's use of the firearm was reasonable under the circumstances.  [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.  The defendant must have believed there was imminent danger of great bodily injury to (himself/herself/ [or] someone else).  Defendant's belief must have been reasonable and (he/she) must have acted only because of that belief.  The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation.  If the defendant used more force than was reasonable, the defendant did not act in lawful (self-defense/ [or] defense of another).  [¶] When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed.  If the defendant's beliefs were reasonable, the danger does not need to have actually existed.  [¶] *Great bodily injury* means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.  [¶] [The defendant's belief that (he/she/someone else) was threatened may be reasonable even if (he/she) relied on information that was not true.  However, the defendant must actually and reasonably have believed that the information was true.] [¶] [If you find that _____ *<insert name of person who allegedly threatened defendant>* threatened or harmed the defendant [or others] in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.] [¶] [If you find that the defendant knew that _____ *<insert name of person who allegedly threatened defendant>* had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.] [¶] [Someone who has been threatened or harmed by a person in the past, is justified in acting more quickly or taking greater self-defense measures against that person.] [¶] [If you find that the defendant received a threat from someone else that (he/she) reasonably

8

"Self-defense negates culpability for assaultive crimes, whether or not the assault results in death." (*People v. Adrian* (1982) 135 Cal.App.3d 335, 340.) "[T]he prosecution must prove beyond a reasonable doubt the absence of justification, herein self-defense, *when* the issue is properly presented . . . ." (*People v. Banks* (1976) 67 Cal.App.3d 379, 384, italics added.) "The obligation also applies . . . to instruction on defenses when they are supported by substantial evidence. [Citation.] [¶] In this context substantial evidence means evidence which is sufficient to deserve consideration by the jury and from which a jury composed of reasonable persons could conclude the particular facts underlying the instruction existed. The trial court is not required to present theories the jury could not reasonably find to exist." (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.) Substantial evidence means evidence that, if believed, would be sufficient for a reasonable jury to find a reasonable doubt as to guilt. (*People v. Salas* (2006) 37 Cal.4th 967, 982–983.) A trial court "need not give instructions based solely on conjecture and speculation." (*People v. Young* (2005) 34 Cal.4th 1149, 1200.) We review alleged instructional errors de novo. (*People v. Oropeza, supra,* 151 Cal.App.4th at p. 78; *People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Guiuan* (1998) 18 Cal.4th 558, 569.)

Delpalacio contends, "Ample evidence supported [the self-defense] instruction because it showed [Delpalacio] believed he had to arm himself when Connie had not planned to spend the night at [Matthew's] apartment and did not inform him of her change in plans, [Delpalacio] had a prior encounter with [Matthew] in which [Matthew] was the aggressor and fought him, [Matthew] hated [Delpalacio], and Connie felt as though she was being stalked by [Matthew], who could not let go of the relationship."

A defendant acts in self-defense when he actually and reasonably believes in the need to defend against imminent bodily injury or death. (See *People v. Humphrey* (1996)

---

associated with _____ <*insert name of person who was the alleged source of the threat*>, you may consider that threat in deciding whether the defendant was justified in acting in (self-defense/ [or] defense of another).] [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not temporarily possess the firearm in (self-defense/ [or] defense of another). If the People have not met this burden, you must find the defendant not guilty of this crime."

13 Cal.4th 1073, 1082; see also §§ 197, 198.) "The law [of self-defense] recognizes that the objective component is not measured by an abstract standard of reasonableness but one based on the defendant's perception of imminent harm or death. Because his state of mind is a critical issue, he may explain his actions in light of his knowledge concerning the victim. [Citations.] Antecedent threats as well as the victim's reputation for violence, prior 'assaults, and other circumstances [are] relevant to interpreting the attacker's behavior.' [Citations.] While such considerations alone do not establish a right of self-defense [citation], they illuminate and reflect on the reasonableness of defendant's perception of both the imminence of danger and the need to resist with the degree of force applied. [Citation.] They may also justify the defendant 'in acting more quickly and taking harsher measures for [his] own protection in the event of assault, whether actual or threatened, than would a person who had not received such threats.' [Citation.]" (*People v. Humphrey, supra,* 13 Cal.4th at p. 1094.) " ' "[P]revious threats alone, however, unless coupled at the time with an apparent design then and there to carry them into effect, will not justify [an] assault . . . ." ' [Citation.]" (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1359.)

The problem with Delpalacio's theory is that both self-defense and defense of others require a fear of imminent harm. "[T]he fear must be of imminent harm. 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.' [Citation.]" (*People v. Humphrey, supra,* 13 Cal.4th at p. 1082.) Delpalacio did not testify. Although " 'substantial evidence of a defendant's state of mind may be found in the testimony of witnesses other than a defendant' " (*People v. Oropeza, supra,* 151 Cal.App.4th at p. 82), there was no evidence that Delpalacio appeared afraid of imminent harm to himself or Connie. In fact, it was undisputed that, after Delpalacio entered Matthew's apartment, he walked past Connie, who was in no apparent danger. And, Connie did not testify that Delpalacio pointed a gun at Matthew only after Matthew drew his or otherwise placed Delpalacio in fear of imminent harm.

She only testified that she did not see a gun. Her testimony, if believed, did not describe an assault in self-defense or defense of others.

Eric and Matthew testified that Delpalacio broke down Matthew's door in the middle of the night, appeared angry, walked past Connie and straight into Matthew's bedroom, where he immediately pointed a gun at Matthew's head. The assault with a deadly weapon, burglary, and possession of a firearm were complete at this point. And, the fact that Matthew pointed or fired his weapon thereafter is of no import. "It is well established that the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*People v. Hill* (2005) 131 Cal.App.4th 1089, 1102, disapproved on other grounds by *People v. French* (2008) 43 Cal.4th 36, 48, fn. 5.)

The trial court did not err in refusing CALCRIM No. 3470. Because there is no substantial evidence of self-defense or defense of others we need not further consider Delpalacio's additional requests for instruction.

### III. DISPOSITION

The judgment is affirmed.

_____
Bruiniers, J.


We concur:


_____
Jones, P. J.


_____
Simons, J.

11