Filed 6/18/14  P. v. Guzman CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057027 |
| v. | (Super.Ct.No. FVA1001864) |
| JOSE ABRAHAM GUZMAN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Arthur Harrison, Judge.  Affirmed.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steven T. Oetting and Barry Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant, Jose Abraham Guzman, guilty of first degree murder. (Pen. Code, § 187, subd. (a).)[1] The jury found true the allegation that defendant used a deadly or dangerous weapon in the commission of the murder. (§ 12022, subd. (b)(1).) The trial court sentenced defendant to prison for a term of 26 years to life. Defendant asserts his trial counsel was ineffective for declining to have the jury instructed on the defense of voluntary intoxication. The People concede or assume there was sufficient evidence to support giving the voluntary intoxication instruction, but assert a reasonable attorney could have concluded it was a good strategy to forego the instruction. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

Defendant and his wife, Yesenia Vega (Vega), lived in an apartment in Rialto with an apartment mate, Erika Valle (Erika).[2] In the early hours of December 5, 2010, defendant, Vega, and Erika had a party at their apartment. Alexandro Alvarado (the victim) attended the party with his date, Lisa Ramirez (Ramirez). The victim had known Ramirez for approximately two weeks. Ramirez knew a few of the people at the party, including Rosa Valle (Rosa), but the victim did not know anyone at the party other than Ramirez. Most people at the party were drinking and appeared intoxicated.

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

[2] We use first names for clarity, due to people involved in the incident sharing the same last name. No disrespect is intended.

Defendant was drinking at the party. Defendant began drinking beer around 9:00 p.m. Defendant drank approximately eight beers during the course of the party.

During the party, at approximately 2:00 or 2:20 a.m., Rosa argued with her boyfriend, David Castrejon (Castrejon). Erika tried to intervene; Rosa and Erika are sisters. Castrejon then began arguing with Erika. The victim intervened, telling Castrejon to "calm down and drink another beer." Castrejon left, but then returned. The victim's date, Ramirez, decided to leave the party.

Before the party, the victim had purchased beer, which Ramirez and the victim brought with them. As the victim and Ramirez were leaving the party, Ramirez picked up their remaining beer, in order to take it with them. Vega grabbed the beer from Ramirez's hands and began yelling because Ramirez was taking the beer. Vega pushed Ramirez to the floor. The victim tried to pull Vega off of Ramirez and told Vega to "stop." Vega fell to the ground when the victim pushed her.

People at the party crowded around Vega, Ramirez, and the victim. The victim "pulled out a knife," in order to keep the crowd away. The victim waved the knife around as he walked backwards, toward the front door of the apartment; the victim appeared to be angry. The victim gave Ramirez the keys to his truck and told her to start it. Ramirez exited the apartment, followed by the victim. Erika closed the apartment door behind them because it appeared the victim was trying to reenter the apartment. The victim used his knife to break a window on the apartment's front door. The victim said to the people inside the apartment, "[You] don't know who [you]'re messing with."

3

Erika opened the apartment door and asked, "'What did you do?'" Erika exited the apartment along with Vega and defendant. The victim and Ramirez were backing down the walkway. The victim responded, "'You don't know who you're messing with.'" Ramirez walked to the passenger side of the truck. Erika tried to photograph the victim's truck's license plate. The victim stood in front of the truck's rear license plate, to block the photograph. The victim was still holding his knife.

Erika moved to the front of the truck and tried to photograph the front license plate. The victim demanded Erika's telephone. Erika threw her telephone to the victim. The victim caught the telephone, removed the battery, and "threw it" toward the apartment. It appeared the victim was "trying to get [Erika] with his knife." At that point, Gustavo Robles (Robles) began fighting with the victim. Robles swung at the victim. The victim used his knife to cut Robles's finger; Robles's finger began bleeding.

Vega went to the passenger side of the truck and banged on the window, "trying to get [Ramirez] out." Ramirez was scared. Defendant "got pissed off cause [the victim] crossed the line." Defendant went inside the apartment and retrieved a butcher knife. Castrejon then joined Robles in fighting the victim. The victim waved his knife from side to side and moved away from Castrejon and Robles.

Defendant, with the butcher knife in his hand, exited the apartment and joined Castrejon, Robles, and the victim. Defendant told the victim to leave. The victim said, "'Yes I'm going,'" but moved toward Erika or another person. Castrejon and Robles

4

"grabbed" the victim, and were hitting him. While Castrejon and Robles were "holding" the victim, defendant stabbed the victim.

The victim said to defendant, "'Did you see you fucked me up?'" Defendant responded, "'Asshole because I'm telling you go, asshole.'" The victim explained, "'Look you already fucked me up.'" The victim walked or ran down the street, leaving a trail of blood. Defendant, Castrejon and Robles chased after the victim.

Eventually, defendant, Castrejon, and Robles went back to the area outside defendant's apartment. Castrejon yelled at Rosa to get in the car so they could leave. Defendant said "he poked him, poked him twice." Defendant had the knife in his left hand and blood on his left hand and on his shirt. Defendant went inside his apartment. Defendant told Vega "[I] cut him," and "I don't want to go to jail, help me." Vega yelled at defendant asking him, "[W]hat did [you] do?"

At 2:45 a.m., City of Rialto Police Officer Hintz was dispatched to the area down the street from defendant's apartment. Hintz arrived at 2:50 a.m. and saw the victim on the ground. The victim did not have a pulse and was not breathing. The victim appeared to be deceased. People standing near the victim directed Hintz to defendant's apartment. Hintz went to defendant's apartment. Hintz "banged" on the door, but no one responded. Hintz and other officers used a battering ram to forcefully open the door.

Inside the apartment, upstairs, officers encountered another locked door. Officers kicked open the door, and found defendant inside the room. Defendant struggled with the officers for a few seconds, but was "tackled" to the floor and

5

restrained.  During a police interview, Detective Quinonez asked defendant how many beers he drank.  Defendant said he drank approximately eight beers—Bud Light and Modelo.  The following exchange then took place:

"Det. Quinonez:  Is it a possibility that you drank, drank more?

"Defendant:  No, no.

"Det. Quinonez:  One more, two more than eight or?

"Defendant:  No, no, no I was cool.

"Det. Quinonez:  Okay, okay.

"Defendant:  I drank and was cool because . . .

"Det. Quinonez:  Well so you weren't drunk?

"Defendant:  No, yeah I was, later I was drunk then but, well because it hits you later.

"Det. Quinonez:  So you were drunk?

"Defendant.  Well later yeah."

The interview continued:

"Det. Quinonez:  Eight, eight beers[,] it's not a lot.

"Defendant:  It's not a lot.

"Det. Quinonez:  It's not a lot for you."[3]

When discussing how "the whole show started," defendant explained that Vega "hates" it when someone brings beer to a party and then takes it when s/he leaves.

---

[3] Defendant's probation report reflects he is five feet, nine inches tall, and weighs 260 pounds.  Defendant described himself as "fat."

Defendant said he tried to calm Vega saying, "'Well let her [take it] it's her beer.'" Defendant told Vega to "move away go over there," presumably away from the arguing or fighting. Defendant said he and everyone else at the party "were all very scared" and "were all like scared" by the victim's behavior with the knife.

When describing the fight outside, defendant explained that he repeatedly told the victim to leave. For example, defendant said, "'Just leave please, we [are] fine.'" When discussing the stabbing, defendant said, "What needed to happen happened."

Defendant said he could not recall where he stabbed the victim. When the detective asked if the victim was stabbed in the chest or back, defendant said, "I don't know what happened . . . ." Defendant explained to the detective, "I was pissed . . . well I let myself be go [*sic*] because of the beers, you follow me." Defendant believed the victim had "crossed the line," which caused defendant to be "pissed off." Defendant explained to the detective, "I got mad because I was like what do you mean they're fighting, even my wife." Defendant said he became upset when the victim "start[ed] doing all this shit," such as breaking the window in the door. The following conversation took place:

"Det. Quinonez: Well you were . . .

"Defendant: Drunk.

"Det. Quinonez: I didn't know that.

"Defendant: I can't fight, can I fight it well because I was defending myself because, you understand me?"

7

The detective asked what defendant was thinking when he stabbed the victim. Defendant said, "Nothing." Defendant explained, "I didn't, didn't think anything . . . . [¶] . . . [¶] Like boom, you understand me I wasn't thinking anything just, I don't know what happened to me . . . ."

Defendant told the detective he did not call the police about the victim using a knife because defendant "[d]idn't think" and the people at the party, including defendant, "were all drunk." The conversation continued:

"Det. Quinonez: But they told me that you were not drunk, drunk.

"Defendant: Well but with a few beers you get like drunk."

The victim died as a result of a stab wound in his left armpit. The knife plunged six inches into the victim's chest cavity, severing a large vein and cutting his left lung, which collapsed. The victim's arm would have been fully extended, away from his body, at the time of the stabbing because the armpit area could not be accessed if the victim's arm were down at all, next to his body. At the time of his death, the victim's blood-alcohol level was between 0.08 and 0.12 percent.

Defendant did not present evidence at trial. After the defense rested and the jury was excused, the trial court asked, "I take it there's not any intoxication defense that's being asserted?" Defendant's trial counsel, Daniel Faulhaber (Faulhaber), responded, "No. The indication was that the defendant, throughout the course of the evening, had consumed somewhere about eight beers. That was on the tape. And that commenced, according to the defendant, between—beginning, like, 9:00 p.m., give or take a little bit, and continued through 2:00 a.m., so I don't think—"

8

The trial court responded, "So it's not being asserted. It just occurred to me when I was putting instructions together it might come in at trial. That's why I included it, but it's not now." During closing argument, Faulhaber argued defendant was not guilty because "[h]e was justified in killing or using a knife to kill someone in self-defense or in defense of another. The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury." Faulhaber asserted it was not entirely clear that the victim was being held by Castrejon and Robles at the time of the stabbing, but it was clear the victim had a knife and had used it against the door, Erika, and Robles.

The prosecutor argued the murder was premeditated. In regard to malice, the prosecutor said, "There's two different types of malice. The first being express. That means that he absolutely intended to kill. That when he went out there with that knife, he intended to kill [the victim]. That's express malice.

"There's another type of malice. It's implied. And there's four separate things that we talk about for implied malice. The first being that he intentionally committed an act. The defendant did. He said as much. He didn't make a mistake when he went out into the street with that knife and made that motion. He did not make a mistake. That was an intentional act. The natural and probable consequence of the act were dangerous to human life.

"Now, it would be laughable to think that anybody would think that sticking a knife, a butcher knife, in someone's chest cavity wouldn't be harmful to human life. That is a dangerous act that he did. He proved it dangerous because [the victim] is no

9

longer with us. At the time he acted, he knew his act was dangerous to human life. [¶] Well, he saw [the victim] out there with a knife. Well, what did he do? He armed himself. He got himself a weapon, something that he could defend himself with. So he knew what he was doing with that knife. [¶] Now, he deliberately acted with conscious disregard for human life. He didn't say, Hmm, I wonder what happens when I stick a knife in someone's chest cavity. He deliberately acted especially from what he said.

"And this doesn't mean that the defendant had to hate [the victim] or had any ill will towards the guy. What it means is he did these four things. So malice, that's one thing that we hear in common speech. And sometimes legal meanings are different than what we hear on the street. So this is one of them." The jury was instructed on both express and implied malice. The jury was also instructed on provocation (CALCRIM No. 522), heat of passion voluntary manslaughter (CALCRIM No. 570), and imperfect/unreasonable self-defense voluntary manslaughter (CALCRIM No. 571). The jury was further instructed that it was the prosecution's burden to prove defendant did not act in reasonable/perfect self-defense of himself or others. (CALCRIM No. 875.)

## DISCUSSION

Defendant contends his trial counsel was ineffective for declining the voluntary intoxication instruction.

"It is well settled that '[a]n instruction on the significance of voluntary intoxication is a "pinpoint" instruction that the trial court is not required to give unless requested by the defendant.' [Citation.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 295.) "'[A] defendant is entitled to such an instruction only when there is substantial

10

evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent."' [Citation.]" (*Ibid.*)[4] A voluntary intoxication instruction is applicable for the jury to determine "whether the defendant premeditated, deliberated, or harbored express malice aforethought" (§ 29.4, subd. (b)); it is not relevant to implied malice. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1114-1115.) Thus, under an implied malice theory, a voluntarily intoxicated defendant could be convicted of second degree murder—only premeditation and deliberation would be affected by the intoxication. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1376-1377.)

Imperfect/unreasonable self-defense negates all malice, both express and implied. (*People v. Lasko* (2000) 23 Cal.4th 101, 109, 114.) Imperfect self-defense means the defendant subjectively believes in the need to defend himself, but the belief is objectively unreasonable. As a result, under imperfect self-defense, the defendant cannot be convicted of murder, but may be convicted of voluntary manslaughter. (*People v. Por Ye Her* (2009) 181 Cal.App.4th 349, 353.) Perfect/reasonable self-

---

**4** The voluntary intoxication instruction provides: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation[,]] [[or] the defendant was unconscious when (he/she) acted[,]] [or the defendant . . . <*insert other specific intent required in a homicide charge or other charged offense*>.] [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose." (CALCRIM No. 625.)

defense requires the defendant's subjective belief to also be objectively reasonable. If perfect self-defense applies, then the homicide is justifiable and the defendant is exonerated. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

"A criminal defendant's federal and state constitutional rights to counsel [citations] include[] the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Hung Thanh Mai* (2013) 57 Cal.4th 986, 1009.)

The record does not affirmatively disclose that defendant's trial counsel (Faulhaber) lacked a rational tactical purpose for declining the voluntary intoxication

instruction. To the contrary, when declining the instruction, Faulhaber began explaining why he believed the evidence may not support a finding that defendant was intoxicated. Faulhaber conceded the evidence reflected defendant drank approximately eight beers over a five-hour period, so the instruction may not be warranted by the evidence. The trial court then interrupted Faulhaber, saying, "So it's [(the intoxication defense)] not being asserted." Thus, it appears Faulhaber was beginning to explain his tactical reasons for declining the instruction when he was interrupted. As a result, there is not an affirmative disclosure of a *lack* of tactical reasoning.

As to the second step—whether counsel was asked to give a reason and refused—the same portion of the record described *ante*, resolves this step. Faulhaber was beginning to disclose his reasons for declining the instruction when he was interrupted. Thus, the conviction cannot be reversed for a failure to disclose reasoning, Faulhaber volunteered his reasoning to the extent permitted by the trial court.

We now turn to the third step—whether there could be no satisfactory explanation for Faulhaber's decision. As discussed *ante*, Faulhaber believed the intoxication evidence was weak, due to the amount of alcohol consumed by defendant—eight beers in a five-hour period. Faulhaber correctly recalled the evidence: defendant admitted drinking approximately eight beers from 9:00 p.m. to 2:00 a.m. During the police interview, defendant vacillated between (1) claiming to be "very scared" of the victim, while also being the voice of reason, and doing what had to be done, e.g., defendant said "What needed to happen happened"; and (2) claiming to be drunk, angry, and not thinking.

13

Defendant's first claim could support the idea of self-defense or defense of others, while the second claim could support a theory of voluntary intoxication. In other words, there is evidence arguably supporting both theories.[5] Faulhaber was correct that the evidence of defendant's level of intoxication could be considered weak, due to the amount of beer consumed. While arguably, the evidence of self-defense or defense of others could be viewed as a bit stronger, given that the victim had broken the glass in the door with his knife, threatened Erika with his knife, and cut Robles with his knife.

Given that imperfect self-defense would reduce the offense to voluntary manslaughter, and perfect self-defense would result in defendant's acquittal, Faulhaber could have reasonably elected to proceed with a single self-defense theory, rather than trying to have the jury reconcile intoxication and self-defense. Of the two theories available, Faulhaber selected the one that arguably had stronger evidence and would result in a lesser crime, if not exoneration.

In other words Faulhaber was arguably faced with deciding between three options: (1) argue voluntary intoxication, with the weak evidence regarding the amount of beer consumed, and possibly obtain a second degree murder conviction; (2) argue self-defense, with the evidence concerning the victim's use of the knife, and possibly obtain a voluntary manslaughter conviction or acquittal; or (3) argue both self-defense and voluntary intoxication, asking the jury to reconcile defendant's differing versions of

---

[5] The People concede, or at least proceed with the assumption, there is evidence that would support instructing the jury on the law of voluntary intoxication. Accordingly, we do not provide an in-depth substantial evidence discussion.

the events—(a) that he was scared, the voice of reason—asking the victim to leave, and only stabbing the victim because it was necessary; and (b) that he was drunk, angry, not thinking, and therefore could not recollect exactly what happened.

A reasonable attorney could have elected not to argue both theories to the jury because the evidence was somewhat contradictory. On the intoxication side, defendant asserted he was drunk and could not recall exactly what happened, while on the self-defense side, defendant assert he did what "needed" to be done. Faulhaber could have reasonably decided that the contradictory portraits of defendant would not persuade the jury if presented together. Thus, Faulhaber eschewed the voluntary intoxication theory with its weaker evidence and greater crime (second degree murder), in favor of self-defense with arguably stronger evidence and a lesser crime or acquittal. Whether the decision was correct is not for us to decide, we conclude only that a rational basis existed for declining the voluntary intoxication instruction. As a result, we conclude Faulhaber's legal assistance fell within an objective standard of reasonableness under prevailing professional norms.

Defendant asserts the voluntary intoxication evidence was stronger than the self-defense evidence, so a reasonable attorney would not have elected to proceed without the voluntary intoxication defense. We agree with defendant in part. A reasonable attorney may look at the case and conclude the voluntary intoxication evidence is stronger than the self-defense evidence, as defendant argues; however, as explained *ante*, a reasonable attorney could also assess the case and come to the conclusion that the self-defense evidence was stronger.

The point is that defendant vacillated between the self-defense statements and the voluntary intoxication statements, so both options were available. It was not unreasonable for Faulhaber to elect the self-defense option, although he could have reasonably also selected the voluntary intoxication option. In sum, defendant is correct that a reasonable attorney could have argued the voluntary intoxication theory, but we disagree with defendant's conclusion that it was unreasonable to argue the self-defense theory (for the reasons given *ante*). The case can reasonably be viewed as having two options for defense theories, and it was reasonable for Faulhaber to proceed with the self-defense theory. In other words, given the different available defense theories, we cannot use hindsight to now conclude Faulhaber made the incorrect choice. At the time of trial, it was reasonable for Faulhaber to select self-defense over voluntary intoxication; therefore, we are not persuaded Faulhaber rendered ineffective assistance of counsel.

Defendant asserts that if self-defense was a viable theory, then Faulhaber should have presented both theories, because the theories are legally compatible. For example, defendant may have been intoxicated and therefore unreasonably believed he needed to defend himself or others. Again, defendant is correct that this was another reasonable option; however, it does not mean Faulhaber's performance was deficient for selecting a different, but equal, viable defense theory.

Faulhaber could have reasonably concluded that the "self-defense only" option was the better option, rather than presenting both theories, because while the theories may be legally compatible, they were not necessarily factually compatible. For

16

example, during defendant's police interview, he presented what could be seen as two different versions of his actions: (1) he was reasonable (trying to calm Vega and asking the victim to leave) and scared of the victim; and (2) he was intoxicated, angry, and not thinking. A reasonable attorney could conclude that presenting both theories may be problematic, because the evidence supporting the two theories could be seen as contradictory. Thus, while presenting both theories was an option, a reasonable attorney could have elected to present only the self-defense theory. As a result, we conclude Faulhaber's performance fell within the wide range of reasonable professional assistance.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                                    J.

We concur:

KING _____
                Acting P. J.

CODRINGTON _____
                                J.

17